**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WEALTHY MAX LIMITED,** | |
| Plaintiff | Case No. <u>26 - 02092</u> |
| v. | |
| **UNITED STATES MINT,** an agency of the United States Department of the Treasury; | |
| **PAUL HOLLIS,** in his official capacity as Acting Director of the United States Mint; | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF**

**(Administrative Procedure Act – Agency Action Unlawfully Withheld and Arbitrary and <u>Capricious Action; Fifth Amendment</u>)**

Plaintiff Wealthy Max Limited ("Wealthy Max"), by and through undersigned counsel, alleges as follows:

Plaintiff does not seek monetary damages in this action but expressly reserves all rights to pursue compensation, including lost profits and related economic damages, in the United States Court of Federal Claims.

1

## I. INTRODUCTION

1. This action seeks judicial review under the Administrative Procedure Act of the United States Mint's closure of the mutilated coin redemption program and its failure to process Plaintiff's mutilated coin submissions after failing to issue a lawful administrative determination concerning those shipments despite repeated requests for administrative resolution. The Administrative Procedure Act authorizes federal courts to compel agency action unlawfully withheld or unreasonably delayed where an agency fails to take a required administrative action. See 5 U.S.C. § 706(1); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004); *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC"). Despite Plaintiff's submissions and repeated requests for action, the Mint never issued a decision approving or denying redemption of the shipments, leaving the submissions in prolonged administrative limbo—neither redeemed, rejected, forfeited, nor formally adjudicated.

2. The shipments at issue consist of fifty-three crates of mutilated United States coins (approximately 122,349 pounds) submitted by Plaintiff Wealthy Max for redemption through the Mint's Mutilated Coin Redemption Program. Prior to shipment, the coins had been staged at a warehouse facility arranged by Plaintiff at E.T.I., pending processing through the program.

3. The coins had been sourced from scrap reclamation facilities in China, cleaned and sorted at Plaintiff's processing facility there, and transported to Plaintiff's Hong Kong warehouse, where they were staged beginning in 2015 pending shipment for redemption through the Mint's program.

4. During the relevant period, the coins were available for inspection by United States authorities. At least one shipment was detained by U.S. authorities and subsequently released following consultation with officials of the United States Mint.

5. For more than a decade (2002–2017), Plaintiff lawfully participated in the United States Mint's Mutilated Coin Redemption Program pursuant to 31 U.S.C. § 5120. The parties operated under a well-established and consistent course of dealing: the Mint would request or accept shipments of mutilated coin material, and Plaintiff would arrange for the preparation and delivery of such material to designated processing facilities. Upon receipt, the Mint (or its designated processors) would examine, authenticate, melt, and redeem the coins at face value.

6. This course of dealing is reflected in contemporaneous shipping records, SGS inspection reports, packing lists, and commercial invoices documenting repeated, large-scale consignments of mutilated United States coins over multiple years. These records demonstrate shipments occurring on a regular and frequent basis, often in closely spaced intervals, with individual consignments typically in the range of approximately 18,000 to 20,000 kilograms.

7. The records further reflect standardized preparation, packaging, and inspection procedures, including the use of sealed wooden crates, independent third-party inspection and verification, and documented gross-weight measurements for each shipment. The shipments were consistently directed through the Mint's established processing channels, including facilities operating on behalf of or in coordination with the United States Mint.

8. Representative examples of these shipments, together with a summary table and associated photographic documentation illustrating the scale and consistency of such shipments. These materials illustrate the continuous, systematic, and commercial-scale nature of Plaintiff's participation in the Program over an extended period of time. (See Exhibit F.)

9. In March 2015, the Department of Justice filed a civil forfeiture complaint relating to the seized Wealthy Max coin shipments in *United States v. One 2014 Black Porsche, et al.*, Civil No. 15-5814 (D.N.J.) (amended August 2015). The case was transferred to this District on defense motion. On July 21, 2016 the superseded case was dismissed with prejudice. (See Exhibit C.) During the July 14, 2016 hearing the government acknowledged in open court that several factual allegations in the complaint were incorrect, after the Court noted that the allegations had been identified as inaccurate during the proceedings.[1] (See Exhibit D.).

10. Independent reporting within the metals-recycling industry later documented both the dismissal of the forfeiture action and the absence of confirmed counterfeiting within the mutilated coin redemption program, while also providing an industry analysis explaining the commercial origin and recycling pathways of mutilated U.S. coins. See Brad MacAulay, *Coins, Counterfeiting & Recycling: An Investigative Report* (American Metal Market 2016) (Exhibit T).

---

[1] Transcript of July 14, 2016 Motion to Dismiss Hearing at 9, 99–100, 104 (D.N.J. July 14, 2016) (government acknowledging inaccuracies in allegations concerning the seized coin shipments).

11. On the eve of that settlement, Wealthy Max was informed that the three shipments seized in 2014–2015 had already been processed by the Mint and converted to coin roll. This was factored into a settlement whereby Wealthy Max received full payment for the three shipments that the Mint had converted and the Mint authorized a one-time "special melt" for the remaining shipment that had been detained. On July 19, 2017, this shipment of exactly 18 one-ton crates were delivered to PMX and melted. The Mint processed the material pursuant to the Program and paid face value for the redeemed coins. (See Exhibit J.)

12. In January 2018 the Mint publicly reopened the Mutilated Coin Redemption Program with enhanced authentication requirements. Shortly thereafter, Plaintiff learned from other program participants, including Portland Mint, that the Mint had scheduled a large industry-wide melt under new procedures. When Wealthy Max conferred with the Mint regarding these developments, it was informed that it would be required to comply with the newly implemented procedures. The Mint further represented that, although it was too late for inclusion in the imminent scheduled melt, Wealthy Max's submissions would be processed in the next available melt cycle.

13. In response on May 21, 2018, to Wealthy Max's application to Wealthy Max's application, Mint officials—including Senior Legal Counsel Apryl Whitaker and Mutilated Coin Redemption Manager Timothy Grimsby—identified certain supplemental information they requested regarding banking details, supplier controls, and related documentation. Wealthy Max provided additional banking information and continued communications with Mint personnel regarding scheduling of a melt date for its stored coin inventory. The Mint did not deny the application or issue any administrative

determination; instead it stated that "additional time is needed to process [the] application and coinage" and that submissions would be handled in the order received. No approval, denial, or other administrative disposition of Plaintiff's shipments was ever issued. Industry participants were later scheduled for a large program melt on or about August 1, 2018, several months after these communications, while no administrative determination was issued concerning Wealthy Max's submissions. (See Exhibit M (Mint correspondence regarding application processing and August 2018 melt scheduling).)

14. As a result of the Mint's failure to process the shipments, the material remained in warehouse storage for multiple years, generating substantial monthly storage charges and ultimately exceeding $216,840 in total storage costs. (See Exhibit S.)

15. Plaintiff was further informed that other participants in the Program had shipments processed during the same industry melt from which Wealthy Max had been excluded. The disparate treatment of similarly situated program participants underscored the uncertainty surrounding the Mint's administration of the Program and its failure to provide any administrative determination regarding Plaintiff's shipments.

16. During this period, other participants in the Program were involved in providing information to investigators. (See Exhibit R.) Upon information and belief, certain of these participants were direct competitors of Wealthy Max in sourcing mutilated coin material and had commercial incentives that were not aligned with Plaintiff's interests. The information provided during this period contributed to investigative conclusions regarding the origin of certain coin shipments, which Plaintiff contends were not supported by the underlying physical characteristics of the material or by subsequent industry analysis.

6

17. By 2021–2022 a remaining 53 crates were incurring ruinous storage fees at E.T.I. International. Public reporting and industry communications regarding investigations and seizures involving other mutilated coin suppliers created a substantial risk that transporting the material commercially could result in further seizure or enforcement action. The Mint never issued a melt date. Plaintiff was forced to abandon the 53 crates on or about April 30, 2022. (See Exhibit R – ETI invoices and notices.)

18. On September 25, 2024, the Mint issued a Final Rule permanently closing the Mutilated Coin Redemption Program that had been in operation since 1911.

19. In that rule, the Mint stated that participants "assumed the risk" that the program could be suspended or terminated.

20. Plaintiff's shipments had already been submitted and remained unresolved for years before the program was closed. The Mint never issued a written determination approving or denying redemption of those shipments.

21. The Final Rule did not address the status of Plaintiff's previously submitted shipments. Other industry participants have likewise raised disputes regarding the Mint's handling of the Program and its closure. (See Exhibit V.)

22. During the period in which the Program was suspended, Plaintiff continued processing and maintained coin inventory staged outside the United States and delayed shipment while seizures were occurring. After the Mint publicly announced that the Program would reopen and accept new submissions, and after Plaintiff's counsel received assurances from Mint personnel that a melt would be scheduled, Plaintiff proceeded to ship the coins for redemption through the Program.

23. The Mint's public description of its obligations concerning legal-tender coinage has changed over time, and prior Treasury materials reflecting those obligations are no longer maintained on official websites but are preserved in archived form.

24. Plaintiff does not seek monetary relief in this action, but only a lawful administrative determination regarding its pending submissions.

## II. JURISDICTION, VENUE, AND TIMELINESS

25. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

26. The claims asserted in this action arise primarily under the Administrative Procedure Act. To the extent Plaintiff asserts claims based on implied-in-fact contract or the Fifth Amendment, those claims are pled solely in the alternative and seek declaratory and equitable relief rather than monetary damages.

27. Any claim for a direct money judgment against the United States is expressly reserved for the United States Court of Federal Claims pursuant to the Tucker Act. This Court may grant declaratory, injunctive, and mandamus-like relief under the APA without encroaching on CFC jurisdiction for money damages.

28. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the United States Mint maintains headquarters and major operational facilities in this District, Mint personnel with whom Plaintiff maintained a longstanding professional relationship

worked here, the 2016 forfeiture action involving Plaintiff's shipments was adjudicated here, and a substantial part of the events giving rise to this action occurred in this District.

29. This action is timely under the six-year statute of limitations in 28 U.S.C. § 2401(a). Plaintiff seeks declaratory and equitable relief concerning the Mint's failure to issue a lawful administrative disposition of Plaintiff's shipments.

## III. PARTIES

30. Plaintiff Wealthy Max Limited is a Hong Kong corporation that participated in the Program from 2002 onward.

31. Defendant United States Mint is the agency responsible for the Program under 31 U.S.C. § 5120.

32. Defendant Kristie McNally is the Acting Director and is sued in her official capacity.

33. The statutory framework governing the Mint's obligations concerning withdrawn United States coinage is described below.

## IV. STATUTORY FRAMEWORK GOVERNING WITHDRAWN UNITED STATES COINAGE

34. The Constitution vests exclusive authority over the Nation's coinage in Congress. U.S. Const. art. I, § 8, cl. 5 grants Congress the power "To coin Money [and] regulate the Value thereof." This authority is exclusive and may not be altered or redefined by executive agencies through regulation or administrative action. Where Congress has

legislated in this field, agency authority is limited to implementation and does not extend to altering the underlying value or redeemability of United States coinage.[2]

35. Congress has implemented its constitutional authority through statutes governing United States coinage, including 31 U.S.C. §§ 5103 and 5120. Section 5103 confirms that United States coins are legal tender for all debts, public charges, taxes, and dues.[3] Section 5120 directs the Secretary of the Treasury to "melt and recoin" obsolete and worn United States coins withdrawn from circulation. The use of mandatory language reflects a non-discretionary statutory duty to remove such coinage from circulation and restore its value through recoinage. The statute does not expressly grant discretion to decline to process such coinage once withdrawn from circulation.[4]

36. The United States Mint historically implemented this statutory framework through administrative procedures under which damaged, worn, or mutilated United States coins could be submitted for examination, melting, and recoinage. These procedures functioned as the operational mechanism through which the statutory directives of 31 U.S.C. §§ 5103 and 5120 were carried out in practice.

37. Over time, the Mint expanded and standardized these procedures, including permitting large-scale commercial submissions and the use of authorized third-party smelters. This system operated consistently for decades and was relied upon by industry participants,

---

[2] See, e.g., Coinage Act of 1792, ch. 16, 1 Stat. 246 (establishing the Mint pursuant to congressional authority); Coinage Act of 1965, Pub. L. 89-81 (demonstrating that material changes affecting the value or composition of United States coinage require explicit congressional authorization).

[3] Treasury materials publicly describing the legal-tender status of United States coinage confirm the longstanding position that United States coins constitute valid payment for debts under 31 U.S.C. § 5103. See U.S. Department of the Treasury, *Legal Tender Status*, archived July 11, 2007, available at https://web.archive.org/web/20070711234101/http://www.treasury.gov/education/faq/currency/legal-tender.html

[4] Coinage Act of 1792, ch. 16, 1 Stat. 246.

including Plaintiff, as the established means of obtaining redemption at face value for genuine United States coinage.

38. This consistent legislative pattern is reflected in analyses prepared by the Congressional Research Service, which are consistent with the principle that material changes to United States coinage programs, characteristics, and authorization have historically required specific congressional enactment. These materials further reflect that the United States Mint operates within a statutorily defined framework and does not possess broad delegated authority to alter the structure, issuance, or effective value of United States coinage absent congressional action. (See Exhibit U.)

39. In practice, a substantial portion of United States coinage reaches its end-stage not through ordinary wear, but through industrial processes that render coins bent, crushed, fused, or otherwise mutilated. These forms of damage fall outside the narrow statutory category of "worn" coinage addressed in 31 U.S.C. § 5120. Congress has not authorized the Mint to eliminate or materially impair the face-value redeemability of this significant and foreseeable category of legal-tender coinage.

40. For decades, the Mint publicly described the Mutilated Coin Redemption Program as the administrative mechanism through which it addressed this category of damaged coinage. Archived Treasury and Mint materials reflect that mutilated coins "received by the Mint are melted" and the metal "recycled in the manufacture of coinage strips," thereby removing damaged coins from circulation while preserving their face-value redeemability. (See Exhibit U – Wayback Machine archive of U.S. Mint statements, July 11, 2007 and Jan. 23, 2018 snapshots.) These

consistent public representations, together with the parties' repeated course of performance, created a mutual understanding that qualifying submissions would be processed and redeemed at face value.

41. By permanently closing the only established administrative channel for the redemption of mutilated coinage, the Mint has effectively eliminated the only practical means of redeeming a significant and foreseeable category of United States coinage without any new congressional authorization, thereby exceeding the authority delegated to the Mint and altering the practical redeemability of United States coinage.

42. During this period, the Treasury Office of Inspector General, in coordination with other federal agencies, conducted testing and analysis of representative samples of mutilated coin material submitted through the Program. These examinations confirmed that the materials consisted of genuine United States coinage produced by the United States Mint.[5]

43. Consistent with this longstanding practice, the United States Mint also publicly described the Mutilated Coin Redemption Program as the operational means of implementing its statutory responsibilities under 31 U.S.C. §§ 5103 and 5120. Mint materials stated that mutilated coins received by the Mint "are melted" and the metal reused for new coinage, thereby removing damaged coins from circulation and supporting the integrity and full faith and credit of United States currency. (See Exhibit U – archived Treasury FAQ, July 11, 2007, and Mint program descriptions.) These materials further reflected a uniform

---

[5] See archived U.S. Department of the Treasury website materials (pre-2015).

and longstanding understanding that mutilated coinage remained redeemable at face value through the Program, reinforcing public confidence in the Nation's coinage.[6]

44. In September 2024, the Mint issued a Final Rule formally terminating the Mutilated Coin Redemption Program. See 89 Fed. Reg. 78241 (Sept. 25, 2024). The Final Rule reflects and implements the Mint's revised characterization of the Program as discretionary, including its position that the Program was not required by statute.

45. The Final Rule does not address the disposition of previously submitted mutilated coin shipments that remained pending at the time of termination, including Plaintiff's submissions, and provides no mechanism for processing, denying, or otherwise resolving such submissions. The Final Rule is silent as to the treatment of previously submitted and accepted shipments, leaving those materials without any administrative disposition.

46. This case arises from the Mint's failure to issue any administrative determination regarding Plaintiff's submitted coin shipments, followed by the termination of the Program without addressing those pending submissions.

## V. THE MINT'S ACTIONS EXCEED STATUTORY AND CONSTITUTIONAL AUTHORITY

47. Plaintiff realleges and incorporates all preceding paragraphs.

48. The Constitution vests exclusive authority to coin money and regulate its value in Congress. U.S. Const. art. I, § 8, cl. 5.

---

[6] Treasury Office of Inspector General, Management Implication Report, Case No. 2008-0096 (Feb. 16, 2010).

49. The statutory framework enacted by Congress, including 31 U.S.C. §§ 5103 and 5120, reflects this constitutional allocation of authority and imposes mandatory obligations concerning the treatment and redemption of United States coinage.

50. By terminating the only practical mechanism through which mutilated and withdrawn coins are redeemed, the Mint has effectively altered the value and redeemability of United States coinage without congressional authorization.

51. This action exceeds the authority delegated to the Mint and constitutes ultra vires agency action and raises serious constitutional concerns under Article I of the Constitution.

52. In addition, to the extent the Mint's actions have deprived Plaintiff of the ability to obtain redemption of lawfully submitted coin material, those actions implicate protected property interests under the Fifth Amendment.

53. Plaintiff seeks declaratory and injunctive relief to remedy these violations. Plaintiff does not seek monetary damages in this action and reserves any such claims for a separate proceeding, if necessary.

## VI. FACTUAL ALLEGATIONS

54. In 2002, Wealthy Max began its participation in the United States Mint's Mutilated Coin Redemption Program developing an operational system for sourcing, processing, and submitting mutilated United States coins for redemption. A commercial recycling industry developed around the Mint's redemption program as large quantities of

mutilated coins were recovered from industrial waste streams and prepared for redemption through the Mint's program.[7]

55. The parties' longstanding course of dealing created expectations and reliance consistent with an implied-in-fact contractual relationship. For more than a decade the Mint would contact Wealthy Max when it needed mutilated coin feedstock, or Wealthy Max would contact the Mint to arrange a smelting appointment for available material. Wealthy Max would then ship the coins. The Mint would authenticate, melt, and pay face value. This was the standard, repeated process. The Mint periodically described the operation of the Program in public guidance and announcements.[8]

56. Independent third-party inspection reports and photographs documented the authenticity and condition of shipments. Independent inspection reports prepared by SGS in Hong Kong documented the inspection of the shipments prior to export, including verification of quantity, packing, and the condition of the mutilated coin material, together with photographic documentation of the crates and coin contents. (See Exhibit G.)

57. When the Mint intervened with Customs and Border Protection to secure the release of detained shipments and permitted Wealthy Max to continue importing and storing additional pallets, those actions reinforced the parties' longstanding course of dealing under which Wealthy Max supplied mutilated coin feedstock and the Mint authenticated, melted, and paid face value. These actions further reflected the parties' mutual

---

[7] *Coin World*, "The Secret Jackpot in America's Waste Stream," Mar. 22, 2016 (Edmund C. Moy).

[8] *Coin World*, "Mint Adopts Mutilated Coin Redemption Program Changes," Sept. 16, 2011 (quoting Mint spokesman Michael White).

understanding that qualifying submissions would be processed through the Program consistent with their prior dealings.

58. All shipments submitted by Wealthy Max were authenticated and paid for by the Mint except the three shipments seized in 2014–2015 and four subsequent shipments that remain unpaid.

59. Three major shipments were seized: June 26, 2014; October 16, 2014; and March 25, 2015. Delivery orders and shipment documentation confirm the dates and contents of the seized shipments. (See Exhibits H and I.) The Department of Justice filed a civil forfeiture complaint in March 2015 (amended August 2015). (See Exhibit B.) The matter was later transferred to the Eastern District of Pennsylvania on defense motion. During the forfeiture proceedings the parties jointly sought additional time from the court while discussions regarding the disposition of the shipments were ongoing. (See Exhibit V.)

60. On July 21, 2016, the forfeiture action was dismissed with prejudice. During the July 14, 2016 argument on motions held before the Honorable Juan R. Sánchez, Wealthy Max identified multiple allegations in the government's complaint that were later acknowledged by the government to be incorrect. The government acknowledged these inaccuracies during the hearing. (See Exhibit D.)

61. Following dismissal of the forfeiture action in July 2016, the remaining shipments were staged in Hong Kong and were available for inspection and melting. Beginning in January 2016, Plaintiff notified United States authorities, including personnel of the United States Mint and Homeland Security Investigations, that the material was available in Hong Kong and invited government representatives to observe or participate in the

16

melt and inspection process. Although one Homeland Security agent acknowledged the request, no government representative ultimately appeared.

62. The Mint later authorized a one-time "special melt," and on July 19, 2017 exactly eighteen one-ton crates were delivered to PMX and melted pursuant to arrangements coordinated with Mint personnel. (See Exhibit J.)

63. On January 29, 2019, eighteen new containers were detained by Customs and Border Protection. The Mint intervened and obtained release.

64. On January 30, 2019, Plaintiff's counsel communicated with Customs and Border Protection officers regarding the detained shipment and explained the standard operational process for mutilated coin submissions under the Mint's program. The communication explained that shipments are imported and stored until the Mint issues a scheduled melt notification, at which time the material is transported to the contracted smelter for just-in-time delivery. The communication further confirmed that multiple crates of Wealthy Max coins were then being stored in a warehouse awaiting notification from the United States Mint of a scheduled melt date. (See Exhibit K (January 30, 2019 correspondence describing standard melt scheduling and storage process).)

65. On March 12–13, 2019, Wealthy Max submitted a finalized application together with supporting documentation and offered assistance to the Mint, including a high-resolution photographic database and a sampling protocol, and offered approximately fifty-three metric tons of coins as control material for comparison with other submissions. (See Exhibits L and N.) Mint Senior Legal Counsel Apryl Whitaker acknowledged receipt of the submission but stated that "additional time is needed to process your application and

coinage" and that "applications are processed in the order they are received." (See Exhibit V.)

66. Plaintiff relied on these communications and continued storing the coin material pending scheduling of a melt date by the Mint. Nearly a year after the communications described above (¶56–57), on June 10, 2019, the Mint confirmed in internal correspondence that it had ceased processing certain mutilated coin submissions pending the development of additional program safeguards. Public notices posted by the Mint likewise stated that the agency had temporarily ceased processing applications and that submissions would be reviewed in the order received. The Mint nevertheless issued no administrative determination approving or denying Plaintiff's submissions. (See Exhibit O.)

67. By November 2021, the fifty-three crates were located at E.T.I. International. Storage costs exceeded $216,840; crates were damaged; and E.T.I. demanded vacatur by April 30, 2022 or abandonment. During March 2022, Plaintiff contacted Mint officials including John Schorn and Apryl Whitaker seeking guidance and resolution regarding the stored shipments. In that correspondence, Plaintiff referenced earlier communications with Mint counsel in March 2019 indicating that a melt would be scheduled for the stored coin inventory and requested clarification regarding the status of the pending submissions. (See Exhibit Q.)

68. At the same time, enforcement actions involving other coin providers increased the substantial risk that any attempt to transport or market the stored coins could result in additional detention or investigation, making commercial disposition of the coins impracticable. (See Exhibit R.)

69. With no administrative processing pathway, mounting storage fees, and continuing enforcement risks, Wealthy Max was ultimately forced to abandon the fifty-three crates on or about April 30, 2022. The coins were not redeemed, forfeited, or otherwise formally adjudicated by the government prior to their abandonment. Storage invoices and abandonment notices from E.T.I. documented the escalating storage costs and the demand that the crates be removed or abandoned. (See Exhibit R.) The government never issued any administrative decision concerning those shipments prior to their abandonment.

70. On September 25, 2024, the Mint issued a Final Rule permanently closing the Mutilated Coin Redemption Program. See 89 Fed. Reg. 78241 (Sept. 25, 2024). The rule did not address the status of Plaintiff's previously submitted shipments, which had remained pending for several years without any administrative determination.

71. Despite repeated written requests and communications with Mint personnel seeking administrative resolution, the Mint has never issued a written determination approving or denying redemption of Plaintiff's shipments, nor has it initiated forfeiture proceedings or any other formal adjudicative process concerning those materials. As a result, Plaintiff's shipments were left in prolonged administrative limbo—neither redeemed, rejected, forfeited, nor formally adjudicated—until the Program was permanently closed in 2024 without any agency disposition of Plaintiff's submissions.[9] The issuance of such a

---

[9] Courts routinely compel agencies to issue decisions when an agency fails to act on matters that it is required to address. See Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984); Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004).

determination is a routine administrative function historically performed by the Mint when evaluating mutilated coin submissions.

72. As a result, Plaintiff's submissions were never the subject of any formal agency disposition before the Program was permanently closed. The sequence of events—submission of the shipments, the Mint's suspension of processing, and the subsequent termination of the Program—left an unresolved administrative gap concerning the status of Plaintiff's previously submitted materials.

## VII. CAUSES OF ACTION

The foregoing conduct gives rise to the following claims for relief.

### COUNT I

**Administrative Procedure Act – Final Agency Action Contrary to Law, Arbitrary and Capricious, and in Excess of Statutory Authority  (5 U.S.C. § 706(2)(A), (C))**

73. Plaintiff repeats and realleges paragraphs 1–72 as if fully set forth herein.

74. The United States Mint's September 25, 2024 Final Rule terminating the Mutilated Coin Redemption Program constitutes final agency action subject to review under the Administrative Procedure Act.

75. The Final Rule is unlawful and must be set aside because it is contrary to law, arbitrary and capricious, and in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(A) and (C).

76. For more than a century, the Mutilated Coin Redemption Program functioned as the operational mechanism through which the Treasury and the Mint implemented their statutory obligations with respect to damaged, worn, and withdrawn United States coinage. The Program was not a discretionary service, but the consistent and uniform administrative means by which the government carried out its duties under 31 U.S.C. §§ 5103 and 5120.

77. For decades, the United States Mint administered the Mutilated Coin Redemption Program through a uniform and consistent framework under which qualified submissions were authenticated, melted, and redeemed at face value, establishing a settled course of agency practice upon which participants reasonably relied.

78. By recharacterizing the Program as discretionary and terminating the only practical mechanism through which mutilated coin material could be redeemed, the Mint adopted a position that conflicts with the governing statutory framework, its own historical practice, and its prior public statements regarding the purpose of the Program.

79. The Final Rule is contrary to law because the Mint lacks authority to eliminate, by regulation alone, the only practical administrative mechanism through which the statutory treatment of such coinage has long been carried out. Congress, not the Mint, holds the constitutional authority to coin money and regulate its value. U.S. Const. art. I, § 8, cl. 5. Where Congress has legislated in this field, the Mint may administer that framework but may not effectively nullify or override it through agency rulemaking.

80. The Final Rule is in excess of statutory authority because it purports to authorize the Mint to terminate a redemption framework that it had no delegated authority to extinguish

21

unilaterally. The historical necessity of specific congressional authorization for material changes affecting coinage confirms that such authority does not reside with the agency as reflected in Congressional Research Service analyses (see Exhibit U).

81. In 1965, when the Mint sought to alter the metallic composition and effective value of circulating coins, it did not proceed by regulation, but instead obtained explicit congressional authorization through the Coinage Act of 1965. The same constitutional and statutory principles apply here. By terminating the only practical redemption channel for mutilated coinage, the Mint has effected a comparable change in the value and redeemability of United States coinage without congressional authorization.

82. The Final Rule is arbitrary and capricious because the Mint reversed its longstanding position without adequate justification, failed to account for over a century of consistent practice, disregarded the statutory framework governing coinage, and ignored substantial reliance interests created by decades of uniform administration of the Program.

83. Participants in the Program, including Plaintiff, relied on this longstanding course of dealing when acquiring, processing, transporting, and storing mutilated United States coins for redemption. Plaintiff structured its operations and incurred substantial costs in reliance on the continued availability of redemption at face value under these established procedures.

84. Despite this established framework and repeated communications from Plaintiff requesting administrative processing and scheduling of a melt, the Mint failed to process Plaintiff's shipments or issue any determination concerning them, and subsequently terminated the Program without resolving Plaintiff's pending submissions.

85. The Mint's departure from this established practice, without reasoned explanation and while continuing to process or accommodate other participants, constitutes arbitrary and capricious agency action under 5 U.S.C. § 706(2)(A). The Mint further failed to provide a reasoned explanation for its departure from longstanding policy and practice, failed to consider the reliance interests of program participants, and treated similarly situated parties differently without justification.

86. The Final Rule is further arbitrary and capricious because it fails to address the treatment of pending or pre-termination submissions, including Plaintiff's shipments, leaving those submissions without any administrative resolution.

87. The Mint's effort to terminate the only practical redemption channel for mutilated coinage, after treating that channel as mandatory in operation for decades, reflects precisely the type of unsupported agency reversal that the Administrative Procedure Act forbids.

88. The Final Rule and the Mint's implementation of it are further arbitrary and capricious because they permit disparate and non-transparent treatment of similarly situated participants. To the extent the Mint has allowed alternative redemption channels or processing for certain parties while denying Plaintiff any determination or access, such selective treatment lacks a rational basis, undermines the uniformity required by the statutory framework governing United States coinage, and violates core principles of reasoned decision-making under the Administrative Procedure Act.

89. The Final Rule also produces irrational and inconsistent outcomes by permitting the Mint to disclaim responsibility for certain categories of coin material while continuing to recognize the legal tender status of United States coins under 31 U.S.C. § 5103.

90. Accordingly, Plaintiff is entitled to an order holding unlawful and setting aside the September 25, 2024 Final Rule pursuant to 5 U.S.C. § 706(2)(A) and (C).

**COUNT II**

**Administrative Procedure Act – Agency Action Unlawfully Withheld and Unreasonably Delayed (5 U.S.C. § 706(1))**

91. Plaintiff repeats and realleges paragraphs 1–72 as if fully set forth herein.

92. The Mint has not, to date, issued any decision approving, denying, or otherwise adjudicating Plaintiff's submissions.

93. The Mint has a duty to issue a determination on submissions presented for administrative review and may not leave such submissions indefinitely unresolved without action.

94. As described above, Plaintiff submitted mutilated coin shipments for redemption through the United States Mint's Mutilated Coin Redemption Program—including 53 crates of material totaling approximately 122,349 pounds—and repeatedly requested administrative processing, evaluation, and scheduling of a melt determination. (See, e.g. ¶¶ 12–17, 64–72.)

95. Under the governing statutory and regulatory framework, the agency was required to take discrete action on such submissions, including issuing an approval, denial, or other

administrative determination, consistent with its longstanding and settled administrative practice. The Mint's obligation to issue a determination on submitted claims arises from its governing statutory framework and longstanding administrative practice.

96. Despite these submissions and repeated communications, the Mint failed to issue any written determination approving or denying Plaintiff's shipments, failed to schedule processing, and failed to provide any final agency action. (See ¶¶ 64–72.)

97. The Mint likewise did not initiate forfeiture proceedings or any other formal adjudicative process concerning the shipments, leaving Plaintiff without any avenue to obtain a decision.

98. As a result, Plaintiff's submissions were left in prolonged administrative limbo for years and ultimately remained unaddressed when the Program was terminated in 2024 without any agency disposition of Plaintiff's pending submissions. (See ¶¶ 65–72.)

99. The Mint's complete failure to act over an extended period, while continuing to engage in related program activity with other participants, underscores the absence of any lawful basis for withholding a determination in Plaintiff's case.

100. This failure constitutes agency action unlawfully withheld and, at a minimum, unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

101. The agency's obligation to act was discrete and mandatory, and not committed to agency discretion. See Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004).

102. The delay is unreasonable under established standards, including the length of the delay, the absence of any articulated timetable, the prejudice to Plaintiff from indefinite non-action, and the lack of any competing justification for withholding a decision. See Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984).

103. Plaintiff has no other adequate remedy in a court.

104. The Mint's prolonged inaction, coupled with its continued engagement with other participants, confirms that the failure to act was not the product of administrative necessity but of arbitrary and selective decision-making. Accordingly, Plaintiff is entitled to relief compelling the Mint to issue a lawful administrative determination regarding Plaintiff's submissions.

## COUNT III

**Ultra Vires Agency Action and Constitutional Violation**

*(5 U.S.C. § 706(2)(C); U.S. Const. art. I, § 8, cl. 5; Fifth Amendment)*

105. Plaintiff repeats and realleges paragraphs 1–72 as if fully set forth herein.

106. The Constitution vests in Congress the exclusive authority to coin money and regulate its value. U.S. Const. art. I, § 8, cl. 5.

107. Congress has exercised that authority through statutes governing United States coinage, including 31 U.S.C. §§ 5103 and 5120, which establish the legal tender status of United States coins and direct the treatment of obsolete and worn coinage withdrawn from circulation. As reflected in nonpartisan Congressional Research Service analysis, material aspects of United States coinage—including issuance, characteristics, and

modification—are governed by statute and require congressional authorization, confirming that such authority resides with Congress and not the Mint. (See Exhibit U.)

108. The United States Mint, as an administrative agency within the Department of the Treasury, is charged with implementing this statutory framework, but does not possess authority to alter the value, redeemability, or legal status of United States coinage absent congressional authorization.

109. For decades, the Mint implemented these statutes through the Mutilated Coin Redemption Program, which functioned as the practical mechanism through which mutilated and withdrawn coinage was authenticated, melted, and redeemed at face value.

110. By terminating the Mutilated Coin Redemption Program—the only established mechanism through which such coinage was processed and redeemed—the Mint has materially altered the practical redeemability of mutilated United States coinage without statutory authorization. The Mint's 2024 Final Rule formalizing that termination reflects this unauthorized action and exceeds the scope of authority delegated by Congress.

111. Mutilated and damaged coins represent a foreseeable end stage of circulating coinage, particularly where coins are subjected to industrial processes that render them bent, crushed, fused, or otherwise non-recoverable through ordinary circulation. These forms of damage fall outside the statutory category of "worn" coinage addressed in 31 U.S.C. § 5120. By eliminating the only established mechanism for their redemption, the Mint has substantially impaired the ability of holders to realize the face value of such coinage, thereby affecting the practical operation of the statutory framework governing

United States coinage. Congress has not authorized the Mint to eliminate or materially impair the redeemability of this category of legal-tender coinage.

112. The uniform value and redeemability of United States coinage is a core attribute of the Nation's monetary system and an essential component of the full faith and credit of the United States. That uniformity cannot be altered through discretionary administrative action absent congressional authorization.

113. The Mint's actions therefore exceed the authority delegated to the agency and constitute agency action in excess of statutory jurisdiction, authority, or limitations, and not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(C).

114. In addition, to the extent the Mint's actions impair the ability of Plaintiff to obtain redemption or otherwise realize the value of lawfully submitted coinage, such actions implicate protected property interests under the Fifth Amendment.

115. Plaintiff seeks declaratory and injunctive relief only under this Count and does not seek monetary damages in this Court. Plaintiff expressly reserves any claim for compensation, if necessary, for a separate proceeding.

116. Accordingly, Plaintiff is entitled to relief declaring that the Mint's actions exceed its constitutional and statutory authority and requiring the agency to comply with the governing legal framework.

117. Congress has not delegated to the Mint the authority to eliminate or materially impair the redeemability of a significant and foreseeable category of United States coinage. Historical practice confirms that material changes affecting the composition,

28

value, or treatment of United States coinage have required explicit congressional authorization. For example, in 1965, Congress enacted legislation to remove silver from dimes, quarters, and half-dollars—demonstrating that even targeted changes to coinage characteristics required legislative action. The Mint's 2024 Final Rule, which eliminates the only practical mechanism for redeeming mutilated coinage, exceeds the limited authority delegated by Congress and is therefore ultra vires and contrary to the statutory framework governing United States coinage.

118.     The Mint cannot accomplish through regulatory termination what it lacks authority to do directly—namely, to alter the value and redeemability of United States coinage—nor may it evade Congress's exclusive authority by eliminating the only practical mechanism through which that value is realized.

119.     By eliminating the only practical mechanism for redeeming mutilated United States coinage without congressional authorization, the Mint has effected a material alteration in the practical value and redeemability of United States coinage. Such action exceeds the limited authority delegated to the agency and infringes upon Congress's exclusive authority under Article I, Section 8, Clause 5 to coin money and regulate its value.

**COUNT IV**

**Implied-in-Fact Contract / Promissory Estoppel (Pled in the Alternative for Declaratory Relief)**

120.     Plaintiff repeats and realleges paragraphs 1–72 as if fully set forth herein.

121. This Count is pled in the alternative and solely for purposes of declaratory and equitable relief.

122. For many years, the parties operated under a consistent course of dealing in which Plaintiff supplied mutilated coin material and the Mint authenticated, melted, and redeemed those coins at face value. (See ¶¶ 5–8, 54–57.)

123. This longstanding course of dealing, together with the governing regulatory framework and the parties' repeated interactions, established mutual assent and a pattern of offer and acceptance sufficient to form an implied-in-fact contractual relationship between Plaintiff and the United States. See, e.g., Portland Mint v. United States, 102 F.4th 1371 (Fed. Cir. 2024).

124. Through its practices and communications, including repeated assurances regarding the scheduling of melts and the processing of submissions, the Mint induced Plaintiff to acquire, process, transport, and store substantial quantities of mutilated United States coins in reliance on redemption through the Program. The Mint accepted and encouraged this course of performance over many years, including by processing prior shipments, coordinating melts, and communicating directly with Plaintiff regarding submission and scheduling. (See ¶¶ 11–13, 55–57, 62, 65.)

125. The Mint's own archived public statements reinforced this course of dealing. By repeatedly describing the Mutilated Coin Redemption Program as the mechanism through which mutilated coins "received by the Mint are melted" and recycled into new coinage, the Mint induced Plaintiff and other market participants to acquire, process, and store substantial volumes of material in reliance on continued redemption at face value. These

representations, together with more than a decade of actual performance—including the processing of over 150 shipments and payments exceeding $38 million—created reasonable and foreseeable expectations that qualifying submissions would be processed in accordance with the Program. (See Exhibit U – Wayback Machine archives.)

126.     By refusing to process Plaintiff's submissions, preventing redemption through established channels, and ultimately terminating the Program without resolving Plaintiff's pending submissions, the government substantially impaired Plaintiff's ability to realize the economic value of those shipments. (See ¶¶ 65–72.)

127.     To the extent these actions constitute a breach of an implied-in-fact contract, detrimental reliance, or a taking of property, Plaintiff reserves all rights to seek monetary relief in a separate proceeding before the United States Court of Federal Claims.

128.     Plaintiff seeks no monetary damages in this action.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

129.     Declare that the Mint's 2024 Final Rule (89 Fed. Reg. 78241) and its prior actions—including the 2019 internal freeze on processing while continuing to correspond with Plaintiff's counsel and induce reliance—are arbitrary, capricious, and in excess of statutory and constitutional authority, an abuse of discretion, in excess of statutory authority, and otherwise not in accordance with law under the Administrative Procedure

Act, 5 U.S.C. § 706(2)(A), (C); and further declare that the Mint's failure to issue any redemption determination concerning Plaintiff's submitted shipments (53 crates, approximately 122,349 pounds) constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1);

130.     Compel the Mint to issue a lawful administrative determination concerning Plaintiff's shipments forthwith and, if the shipments qualify under the Program's applicable standards (as they historically did for Plaintiff's prior 150+ shipments), to process the shipments for redemption and take all action required under applicable law and the Program's governing framework following such determination;

131.     Declare that the parties' longstanding course of dealing and the Mint's representations and conduct are sufficient to establish obligations requiring the Mint to issue a lawful administrative determination concerning Plaintiff's submissions; or, in the alternative, that the government's actions give rise to equitable or contractual obligations entitling Plaintiff to such determination;

132.     Declare that the Mint's archived public descriptions of the Program as the operational mechanism for redeeming and recycling mutilated coins, combined with the parties' longstanding course of dealing, are sufficient to establish an implied-in-fact contractual relationship (or, in the alternative, promissory estoppel), requiring the Mint to issue a lawful administrative determination on Plaintiff's pending shipments;

133.     Award declaratory and equitable relief as appropriate, including any incidental relief necessary to remedy the violations found herein;

32

134.     Award attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law; and

135.     Grant such other and further relief as the Court deems just and proper.

136.     To the extent a monetary judgment is ultimately required beyond the declaratory and equitable relief sought here—including any consequential damages arising from the termination of Wealthy Max's business, lost profits, storage fees, abandonment losses, or other reliance-based harms—Plaintiff expressly reserves that claim for the United States Court of Federal Claims.

**DEMAND FOR JURY TRIAL** Plaintiff demands a jury trial on all triable issues.

Dated: March 30, 2026                    RESPECTFULLY SUBMITTED, By Counsel

/s/ Brad Geyer
Bradford L. Geyer
PA 62998
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

## EXHIBITS IN ORDER

### BACKGROUND AND PROGRAM STRUCTURE

**Exhibit A** — Chronology of Events

**Exhibit E** — U.S. Mint Announcement Regarding the Mutilated Coin Redemption Program (2011)

**Exhibit F** — Historical Shipping Table and Representative Redemption Invoices (2002–2017)

### SHIPMENTS AND AUTHENTICATION

**Exhibit G** — SGS Authentication Reports and Photographs of Coin Shipments

**Exhibit H** — Delivery Orders and Proof of Delivery for 2014 Shipments

**Exhibit I** — Shipment Documentation (WM029 / USD022)

### FORFEITURE PROCEEDINGS

**Exhibit B** — Civil Forfeiture Complaint (Mar. 2015), Amended Complaint (Aug. 2015), and Transfer Order

**Exhibit D** — Transcript Excerpt – July 14, 2016 Hearing (Government Admissions)

**Exhibit C** — Order Dismissing Forfeiture Complaint With Prejudice (July 21, 2016)

**Exhibit V** — Joint Motion for Enlargement of Time Filed in the 2016 Forfeiture Proceedings

### POST-FORFEITURE PROCESSING

**Exhibit J** — U.S. Mint Authorization and Confirmation of July 2017 Special Melt (18 Crates)

**MINT COMMUNICATIONS AND APPLICATION PROCESS**

**Exhibit K** — January 30, 2019 Email from Plaintiff's Counsel to CBP and Mint Personnel Describing Storage and Melt Scheduling Process

**Exhibit M** — U.S. Mint Correspondence Regarding Alleged Application Deficiencies (2018–2019)

**Exhibit N** — March 12–14, 2019 Email Chain Between Plaintiff's Counsel and U.S. Mint (Melt Request and Mint Response)

**Exhibit O** — U.S. Mint Confirmation of Suspension of Mutilated Coin Redemption Processing (June 10, 2019) and Archived Program Notice

**Exhibit P** — April 21, 2019 Letter from Counsel to the U.S. Mint Director

**UNRESOLVED SUBMISSIONS AND STORAGE CONSEQUENCES**

**Exhibit Q** — March 14, 2022 Letter to the U.S. Mint General Counsel

**Exhibit R** — ETI Warehouse Invoices, Statements, and Abandonment Notices (2021–2022)

**Exhibit S** — Warehouse Storage Charges (Summary Spreadsheet)

**PROGRAM CLOSURE AND INDUSTRY CONTEXT**

**Exhibit T** — Brad MacAulay, *Coins, Counterfeiting & Recycling: An Investigative Report* (American Metal Market 2016)

SUPPLEMENTAL LEGAL AUTHORITY (NON-RECORD MATERIALS)

**EXHIBIT U** — Congressional Research Service Materials on U.S. Coinage Authority

**Exhibit L intentionally omitted.**