# EXHIBIT B

**Forfeiture Complaint, Amended Complaint & Transfer Order (2015)**

**Description:**
Verified civil forfeiture complaint filed March 20, 2015 in the United States District Court for the District of New Jersey, the amended complaint filed August 2015, and the order transferring the action to the Eastern District of Pennsylvania.

**Purpose:**
To document the initiation and procedural posture of the civil forfeiture action involving shipments associated with Plaintiff.

2014V04356

PAUL J. FISHMAN
United States Attorney
By: LAKSHMI SRINIVASAN HERMAN
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel: 973.645.2700
Fax: 973.297.2042
lakshmi.herman@usdoj.gov


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Honorable** |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 15-** |
| | : | |
| **v.** | : | **VERIFIED COMPLAINT FOR** |
| | : | **FORFEITURE IN REM** |
| **ONE 2014 BLACK PORSCHE** | : | |
| **CAYMAN COUPE BEARING** | : | |
| **VEHICLE IDENTIFICATION** | : | |
| **NUMBER (VIN)** | : | |
| **WP0AB2A85EK191487;** | : | |
| | : | |
| **THE REAL PROPERTY KNOWN** | : | |
| **AS 10212 DENTON DRIVE,** | : | |
| **DALLAS, TEXAS;** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **A TOTAL OF APPROXIMATELY** | : | |
| **$5,453,011.81 COMPRISED OF:** | : | |
| | : | |
| **$2,845,428.41 PREVIOUSLY** | : | |
| **DUE AND PAYABLE BY THE** | : | |
| **UNITED STATES MINT** | : | |
| **TO AMERICA NAHA, INC.;** | : | |
| | : | |
| **$2,388,091.18 PREVIOUSLY** | : | |
| **DUE AND PAYABLE BY THE** | : | |
| **UNITED STATES MINT TO** | : | |
| **WEALTHY MAX LIMITED; AND** | : | |

WM-003247

**$219,492.22 PREVIOUSLY**          :
**DUE AND PAYABLE BY THE**          :
**UNITED STATES MINT TO**           :
**XRACER SPORTS CO. LTD.,**         :
                                    :
**Defendants *in Rem.***            :

Plaintiff, United States of America, by its attorney, Paul J. Fishman, United States Attorney for the District of New Jersey (by Lakshmi Srinivasan Herman, Assistant United States Attorney) brings this Verified Complaint for Forfeiture *in Rem* and alleges as follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1.      The United States Department of Homeland Security Investigations ("HSI") has discovered the existence of a scheme to defraud the United States Mint. The investigation has revealed that the individuals and entities discussed herein have imported mutilated counterfeit United States coins, and then fraudulently submitted them to the United States Mint for cash reimbursement through the United States Mint's Mutilated Coin Program. The investigation has further revealed that the Defendant Properties are the proceeds of the scheme discussed herein, or were obtained pursuant to the scheme.

2.      This is a civil action *in rem* to forfeit and condemn to the use and benefit of the United States the above-captioned Defendant Properties pursuant to: (a) 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461, as property real or

- 2 -

WM-003248

personal, which constitutes or is derived from proceeds traceable to offenses in violations of 18 U.S.C. §§ 371 (conspiracy), 485 (counterfeiting coins), 486 (uttering coins), 487 (making or possessing counterfeit dies for coins), 545 (smuggling goods into the United States), 641 (stealing public money), and 1343 (wire fraud), or a conspiracy to commit such offenses; and (b) 18 U.S.C. § 2323 as property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense in violation of 18 U.S.C. § 2320 (trafficking in counterfeit goods), or a conspiracy to commit such offense, and as property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of an offense in violation of 18 U.S.C. § 2320, or a conspiracy to commit such offense.

## THE DEFENDANTS *IN REM*

3.   The Defendant Properties consist of the following:

    a.   one 2014 Black Porsche Cayman Coupe automobile bearing vehicle identification number (VIN) number WP0AB2A85EK191487 (the "Defendant Vehicle");

    b.   the real property located at 10212 Denton Drive, Dallas, Texas 75220 (the "Defendant Real Property");

    c.   A total of approximately $5,453,011.81 (the "Defendant Funds"), comprised of:

        i.   $2,845,428.41, previously due and payable by the United States Mint to America Naha, Inc.;

        ii.   $2,388,091.18, previously due and payable by the United States Mint to Wealthy Max Limited; and

        iii.   $219,492.22, previously due and payable by the United States Mint to XRacer Sports Co. Ltd.

- 3 -

WM-003249

(collectively the "Defendant Properties"). The Defendant Funds are currently in the custody of the United States.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Properties. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. This Court has *in rem* jurisdiction over the Defendant Properties under 28 U.S.C. § 1355(b)(1). Upon the filing of this Verified Complaint, Plaintiff requests that the Clerk of the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which Plaintiff will execute upon the Defendant Properties pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(C).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because the acts and omissions giving rise to the forfeiture occurred in the District of New Jersey.

## BASIS FOR FORFEITURE

7. The Defendant Properties are subject to forfeiture pursuant to: (a)18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461, as property real or personal, which constitutes or is derived from proceeds traceable to offenses in violations of 18 U.S.C. §§ 371, 485, 486, 487, 545, 641, 1343, or a conspiracy to commit such offenses; and (b) 18 U.S.C. § 2323 as property used, or intended to be used, in any manner or part, to commit or facilitate the commission of an

WM-003250

- 5 -

offense in violation of 18 U.S.C. § 2320, or a conspiracy to commit such offense, and as property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of an offense in violation of 18 U.S.C. § 2320, or a conspiracy to commit such offense.

## STATUTORY BACKGROUND

8. Pursuant to 18 U.S.C. § 371, it is a criminal offense if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and if one or more of such persons do any act to effect the object of the conspiracy.

9. Pursuant to 18 U.S.C. § 485, it is a criminal offense to falsely make, forge, or counterfeit any coin or bar in resemblance or similitude of any coin of a denomination higher than 5 cents or any gold or silver bar coined or stamped at any mint or assay office of the United States, or in resemblance or similitude of any foreign gold or silver coin current in the United States or in actual use and circulation as money within the United States. In addition, it is also a criminal offense, pursuant to 18 U.S.C. § 485, to pass, utter, publish, sell, possess, or bring into the United States any false, forged, or counterfeit coin or bar, knowing the same to be false, forged, or counterfeit, with intent to defraud any body politic or corporate, or any person. It is also a criminal violation to attempt the commission of any offense described in 18 U.S.C. § 485.

WM-003251

10. Pursuant to 18 U.S.C. § 486, except as authorized by law, it is a criminal offense to make, utter, pass, or to attempt to utter or pass, any coins of gold or silver or other metal, or alloys of metals, intended for use as current money, whether in the resemblance of coins of the United States or of foreign countries, or of original design.

11. Pursuant to 18 U.S.C. § 487, it is a criminal offense to make, without lawful authority, any die, hub, or mold, or any part thereof, either of steel or plaster, or any other substance, in likeness or similitude, as to the design or the inscription thereon, of any die, hub, or mold designated for the coining or making of any of the genuine gold, silver, nickel, bronze, copper, or other coins coined at the mints of the United States. Pursuant to 18 U.S.C. § 487, it is also a criminal offense to possess, without lawful authority, any such die, hub, or mold, or any part thereof, or permit the same to be used for, or in aid of, the counterfeiting of any such coins of the United States.

12. Pursuant to 18 U.S.C. § 545, it is a criminal offense for an individual to knowingly import or bring into the United States, any merchandise contrary to the law. Pursuant to 18 U.S.C. § 545, it is also a criminal offense for an individual to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after its importation, knowing that the merchandise was imported or brought into the United States contrary to the law.

13. Pursuant to 18 U.S.C. § 641, it is a criminal offense for an individual to embezzle, steal, purloin, or knowingly convert to his use or the

- 6 -

WM-003252

use of another, any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof. Pursuant 18 U.S.C. § 641, it is also a criminal offense for an individual to sell, convey, or dispose of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof without authority. Furthermore, 18 U.S.C. § 641 make it a criminal offense for an individual to receive, conceal, or retain any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof with intent to convert it to his use or gain, knowing it was embezzled, stolen, purloined, or converted.

14. Pursuant to 18 U.S.C. § 1343, it is a criminal offense for an individual to devise, or to intend to devise, any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

15. Pursuant to 18 U.S.C. § 2320, it is a criminal offense for an individual to intentionally traffic in goods or services and knowingly use a

- 7 -

WM-003253

counterfeit mark on, or in connection with, such goods or services. It is also a criminal offense under the statute to attempt or conspire to intentionally traffic in goods or services and knowingly use a counterfeit mark on, or in connection with, such goods or services.

16. Pursuant to 18 U.S.C. § 2323, the following property is subject to forfeiture to the United States Government: (a) any article, the making or trafficking of which is, prohibited under 18 US.C. § 2320; (b) any property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense in violation of 18 US.C. § 2320; and (c) any property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of an offense in violation of 18 U.S.C. § 2320.

17. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. §§ 371, 485, 486, 487, and 545, or any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense, is subject to forfeiture to the United States. Specified unlawful activities, as defined in 18 U.S.C. § 1956(c)(7), include violations of 18 U.S.C. §§ 641, 1343, and 2320.

18. Pursuant to 28 U.S.C. § 2461 "[w]henever a civil fine, penalty or pecuniary forfeiture is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered in a civil action."

- 8 -

WM-003254

## FACTS

### A.    The United States Mint and the Mutilated Coin Program

19.  The United States Mint is responsible for producing and circulating the nation's coin currency, collector coins, and medals.  Only coins made by the United States Mint are United States legal tender.

20.  The United States Mint's Mutilated Coin Program was implemented on or about February 7, 1911.  The purpose of this program was to allow people and businesses to exchange mutilated coins (also known as "waste" coins) for reimbursement, when their coins were mutilated in a fire, flood, or by other means, and rendered unusable.   At the time of implementation, there was insufficient technology to make counterfeit coins to trade or redeem for profit.

21.  Mutilated coins are defined as otherwise legitimate United States coins that are chipped, fused, discolored, burned, or distorted and not machine countable.  Outdated or "uncurrent" coins are defined as coins that are worn yet recognizable as to the genuineness and denomination, and are machine countable.  All mutilated or outdated coins received by the United States Mint are melted and reused in the manufacture of new coins.  The United States Mint consistently loses money each year on the Mutilated Coin Program because it only makes a profit on the metal it recovers, which is much less than the face value of the redeemed coins.

22.  Small shipments of mutilated coins are mailed or hand-delivered directly to the United States Mint in Philadelphia, Pennsylvania, to be

- 9 -

WM-003255

exchanged for new or non-mutilated currency.  These shipments are visually inspected by personnel at the United States Mint for authenticity and evidence of mutilation.  If accepted, these small shipments of coins are redeemed for face value and stored at the United States Mint until they are transported to a foundry for melting.

23.  Large shipments of mutilated (or "waste") coins that cannot physically be accepted or stored at the United States Mint are delivered directly to one of two contracted foundries, either PMX Industries Incorporated ("PMX"), located in Cedar Rapids, Iowa, or Olin Brass ("Olin"), located in East Alton, Illinois (collectively the "Foundries").  The Foundries melt all coinage returned to the United States Mint for redemption.

24.  The United States Mint reimburses the entity that submitted the mutilated coins using weight formulas that estimate the face value of the coins.

25.  Clad coins are coins that have a core and outer layer made of different metals.  Since 1965, all United States dimes, quarters, and half dollars have been clad.  In addition, all United States dimes, quarters, and half dollars are composed of the same metals.  The outer layer of those coins is approximately 75 percent copper and approximately 25 percent nickel and their core is composed of pure copper.  Since they are composed of the same metals the United States Mint pays a standard rate of $19.84 per pound of mutilated dimes, quarters, and half dollars that are submitted for redemption.

26.  After the mutilated coins arrive at a given foundry, United States Mint personnel witness the melting of the coins.  Once the melting is achieved,

- 10 -

WM-003256

the product is formed into large coils that are sold and shipped to the United States Mint to make into new coins.

27. Upon completion of the melting process, the United States Mint tenders either a United States Treasury Check or a wire transfer to the vendor for the value of the redeemed coins for these large shipments of coins.

**B.     China-Based Imports of Mutilated Coins**

28. In recent years, there has been a sharp increase in the number of large shipments of mutilated coins being repatriated back to the United States from abroad, specifically China.

29. The HSI investigation has revealed that certain individuals and entities are exploiting the Mutilated Coin Program by importing counterfeit mutilated coins from China and then submitting them to the United States Mint for redemption.

30. Beginning in or about 1999, the United States Mint began receiving calls from vendors stating that they had multiple shipping containers full of mutilated "waste coins" from China to redeem. In order to keep up with the increase in volume, the United States Mint began scheduling quarterly melts of mutilated coins at the Foundries. Previously, the melts were scheduled much less frequently and the United States Mint was able to accept all mutilated coins at its facility in Philadelphia.

31. In or about October 2009, the United States Customs and Border Protection ("CBP") noted an increase in the volume of waste coin imports to the Port of Los Angeles and reported the increase to HSI. A number of importers

- 11 -

WM-003257

claimed that the waste coins were collected from cars that the United States exported to China as scrap metal and from other items treated as scrap metal and sent to China.  However, India is the second largest importer of scrap metal from the United States, and the United States Mint has not received any waste coins from India to date.

32.  During that time period, in or about October 2009, CBP and the United States Treasury, Office of Inspector General, analyzed data regarding scrap metal exports versus waste coin imports and determined that, in order for the importers' explanation to be valid, there would have to be approximately $900 in coins in every vehicle ever exported to China as scrap metal in order to account for the total amount of waste coins imported from China for redemption.

33.  Additionally, HSI Agents have interviewed personnel at an automotive salvage yard, a large scrap metal recycler, and one of the largest metal recycling and export facilities on the East Coast.  Through observation and interviews, it appears that anything of value (coins, gasoline, oils/fluids, etc.) is typically removed from the vehicles at the first point of the salvage process.  Before the vehicles are loaded into a shipping container for export, they are meticulously sorted through, with steel and iron (the ferrous metals) being the most abundant and with the lowest value, left to be scrapped.  Other metals, such as stainless steel, aluminum, brass, and copper, have a much higher value and are not mixed with the lower value ferrous metals.  By the time a vehicle is crushed down for export, there is nothing left except ferrous

WM-003258

metals and other material of little value, such as plastics and glass.  The coins recovered by the automotive salvage yard and the large scrap metal recycler usually yield up to only a few hundred dollars a month.

34.  Modern United States coins do not contain an amount of valuable metal, such as silver, equivalent to the face value of the coins.  The raw materials and manufacturing costs for pennies and nickels are close to their face value resulting in no pennies and very few nickels being received for redemption from the China-based vendors.  Consequently, dimes, quarters, and half dollars are more likely than pennies and nickels to be counterfeited and presented to the United States Mint for redemption because their face value is much higher than the total manufacturing cost.

35.  Notably, all of the shipments of mutilated coins from China are a mixture of what appear to be mutilated dimes, quarters, and half dollars, all of which are clad coins.  As noted above in paragraph 25, clad coins are all composed of the same metals.  None of the shipments of mutilated coins from the Chinese importers have ever contained pennies, and only small parts of a few shipments have contained nickels.

36.  Interestingly, United States Mint personnel also believe that more half dollars have been redeemed by the China-sourced vendors in the last ten years than the United States Mint has ever manufactured in its history.

37.  All of the waste coin imports appeared to be corroded (having a greenish-brown patina) and mechanically deformed and/or chipped.  Every importer has provided, in some form, the same explanation regarding the origin

- 13 -

WM-003259

of the coins, which is that the waste coins were retrieved from cars exported by the United States to China as scrap metal or that the coins came from other sources of scrap metal.

38.  HSI Agents have learned from United States Mint personnel that clad coins can be reverse engineered.  In addition, the die striking machinery the United States Mint uses to manufacture its coins are commercially available.  For example, old die striking machines used by the United States Mint were sold as scrap metal to a Chinese company.

39.  According to United States Mint authorities, counterfeiting waste coins would be much easier to accomplish because they are inherently mutilated, and the level of detail needed to make them appear genuine would therefore be much lower.

## C.   <u>Subject Individuals and Entities</u>

40.  HSI Agents have identified the following individuals and entities, among others, as having engaged in a scheme to defraud the United States Mint by submitting counterfeit mutilated coins for redemption:

a.  Qianru "Amelie" Xu ("Xu") – Xu is the registered owner of Guang Han Recycling Company Ltd. ("Guang Han Recycling"), which is located in Guangdong, China.  Guang Han Recycling exported mutilated coins from China to the United States.  Xu also owns Guang Han Trading LLC ("Guang Han Trading"), which is located in New Brunswick, New Jersey.  Guang Han Trading imports mutilated coins from China into the United States.  Xu has also imported coins into the United States through a company called Dragon Form USA ("Dragon Form").

b.  Glenn Nudell ("Nudell") – Nudell is the registered agent of Guang Han Trading.  He is also the registered owner of General Logistics International, Inc. ("GLI"), which has been handling imports of mutilated coins from Guang Han Trading since in or about

- 14 -

WM-003260

November 2010.  GLI is located at 200 Livingston Avenue, New Brunswick, New Jersey, which is also Guang Han Trading's registered business address.

c.  Matthew Wong ("Wong") – Wong does business as Wealthy Max ("Wealthy Max") and Glory Smart.  Glory Smart was once one of the largest suppliers of the mutilated coins for redemption.  HSI has learned that Xu's "bosses" supplied Wealthy Max with counterfeit mutilated coins, which it, in turn, submitted to the United States Mint for redemption.

d.  Kei Yi Loung, a/k/a "Kenny Loung," a/k/a "Kenneth E. Loung" ("Loung") – Loung owns America Naha Inc. ("America Naha"), which handles Dragon Form's importation of mutilated coins into the United States.  Loung also claimed to be a broker for Pacific Worldwide Supply, which exports mutilated coins to the United States for redemption at the United States Mint.

e.  Chang Kyi ("Kyi") – Kyi works with a company called XRacer Sports Co. Limited (XRacer Sports").  HSI Agents have learned that Xu's "bosses" supplied XRacer Sports with counterfeit mutilated coins, which it, in turn, submitted them to the United States Mint for redemption.

f.  On at least one occasion, law enforcement agents conducted surveillance and observed Nudell meet with Xu at the Newark Liberty International Airport, in Newark, New Jersey, upon her arrival from overseas, at which time Nudell transported Xu to GLI's office and a bank in New Brunswick, New Jersey.

41.  Between in or about December 2010 and in or about January 2011, HSI and CBP Agents examined three waste coin imports in Los Angeles.  All three shipments were exported by Guang Han Recycling, imported by Guang Han Trading, and had a declared value of between approximately $287,000 and approximately $400,000.

42.  A CBP laboratory analyzed a sampling of the waste coins mentioned in paragraph 41 above and determined that they contained two elements—aluminum and silicon—that are not present in authentic coins

- 15 -

WM-003261

manufactured by the United States Mint.  The CBP laboratory also determined that other elements, such as nickel and copper, were present in amounts below the specifications set by the United States Mint.  Additionally, the coins all appeared to have been "mutilated" in a uniform manner, namely mechanically cut or deformed and corroded by some type of unknown chemical before being thoroughly washed.

43.    In fact, laboratory analyses of all subsequent samples taken from mutilated coins imported from China and submitted for redemption similarly appear to have been "mutilated" in a uniform manner, namely, mechanically cut or deformed, and then corroded by some type of unknown chemical before being thoroughly washed.  Laboratory analyses also revealed that of all subsequent samples they contained two elements—aluminum and silicon—that are not present in authentic coins manufactured by the United States Mint, and that the amounts of nickel and copper present were in amounts below the specifications set by the United States Mint.

### D.    <u>**Seizure of the Defendant Funds**</u>

44.    Beginning the week of June 23, 2014, XRacer Sports, America Naha, and Wealthy Max submitted large shipments of mutilated coins to the United States Mint for redemption.  The coin shipments were delivered to PMX, a foundry that is used by the United States Mint to melt its coins.

45.    On or about June 24, 2014, PMX melted the mutilated coins submitted to the United States Mint by XRacer Sports, Wealthy Max, and

- 16 -

WM-003262

America Naha, but retained some of the coins as samples. Loung, the owner of America Naha, was present at the melt.

46. Subsequent CBP laboratory analysis of the sample coins concluded that they were not within the specifications provided by the United States Mint, and that they contained elements, such as aluminum and silicon, which are not found in genuine United States coins. Furthermore, these sample coins contained insufficient amounts of certain metals properly found in genuine United States coins, such as nickel and copper. Based upon these findings, HSI determined that the coins submitted to the United States Mint by XRacer Sports, Wealthy Max, and America Naha during the week of June 23, 2014, were counterfeit. Nevertheless, due to the technicalities of the United States Mint's Mutilated Coin Program, the United States Mint was scheduled to pay XRacer Sports, Wealthy Max, and America Naha a total of approximately $5,453,011.81 for their redeemed mutilated coin shipments.

47. As a result, on or about September 4, 2014, HSI Agents obtained a seizure warrant (Mag. No. 14-7185) from the Hon. Cathy L. Waldor, U.S.M.J. The seizure warrant was executed on or about September 17, 2014, on the Defendant Funds. An approximate total of $5,450,000 was seized by the U.S. Attorney's Office for the District of New Jersey, following the receipt of the results from the CBP Laboratory, indicating that the sampled coins were not within the specification of genuine coins.

- 17 -

WM-003263

**E.   The 10212 Denton Drive Property**

48.   The Companies that submitted coins for the June 24, 2014, melt discussed above appear to be related or linked to Luong.  Specifically, on or about June 24, 2014, Loung, the registered agent and director of America Naha, was present at the melt. He was questioned by an HSI agent about the source of the waste coins and stated that the coins came from shredded cars and metal that were incinerated in China by various companies that employ thousands of people that sort through the scrap metal looking for the coins. Loung also stated that the actual importer of the coins was Dragon Form, which is the same company used by Xu to import waste coins in addition to GLI, as discussed in paragraph 40 above.

49.   On or about August 22, 2014, Loung arrived at the Dallas-Fort Worth Airport in Texas. He was returning from a trip to China. CBP conducted a secondary inspection of Loung and discovered documents in his possession along with a handwritten note that contained the contact information for Dragon Form. Loung told CBP officers that he ran a scrap metal company, which was located at 10212 Denton Drive, Dallas, Texas, i.e., the Defendant Real Property, and it exported scrap metal to China and imported mutilated coins into the United States to sell to the United States Mint. Loung also told the CBP officers that he discovered a lot of coins in cars sent from the United States to China for scrap metal.

50.   During the course of the same secondary inspection, Loung changed his story and told CBP officers that he is a broker for a Hong Kong

- 18 -

WM-003264

based company called Pacific Worldwide Supply, which exported mutilated coins to the United States for sale to the United States Mint. Loung also stated that he earns a commission from Pacific Worldwide Supply for each transaction with the United States Mint. Loung stated that Pacific Worldwide Supply sends approximately one to two containers of coins to his company in Texas, which he then delivers to the United States Mint every five or six months. CBP officers found invoices from Pacific Worldwide Supply for "US Mutilated Clad Coins" in Loung's possession.

51.   Loung incorporated America Naha in Texas on or about August 2, 2012.  Loung is listed as the registered agent and director of America Naha in its Certificate of Formation.

52.   Between approximately 2012 and 2014, America Naha has received approximately $6.4 million in reimbursements from the United States Mint for mutilated coins that it submitted.

53.   The approximately $6.4 million in payments from the United States Mint were deposited into a Southwestern National Bank Account (the "Bank") ending in # 8978 ("Account One").  Account One was opened on or about August 17, 2012, and a signatory in Account One's opening documents is Luong.

54.   An analysis of the Bank records has revealed that America Naha does not receive any monies except for the reimbursements from the United States Mint.

WM-003265

55.     Loung formed Phoenix 10212 LLC ("Phoenix") on or about July 9, 2008.  According to Phoenix's Operating Agreement, Loung and his wife, Linda Loung, are Phoenix's managers.  In addition, Phoenix's Operating Agreement lists their three children - Mary Loung, Harry, Loung, and Lian Loung - as Phoenix's only members.

56.     On or about January 28, 2009, Phoenix purchased the Defendant Real Property.  Phoenix obtained an approximate loan of $1,072,500 loan from the Bank to purchase the Defendant Real Property.  The loan's maturity date was on or about January 28, 2014.

57.     On or about February 13, 2013, a payment of approximately $1,517,794.41 from the United States Mint was deposited into Account One.  Shortly thereafter, on or about February 20, 2013, Luong transferred approximately $744,956.00 from Account One to the Bank's account ending in 6118, held in the name of Phoenix 10212 LLC ("Account Two"). On the same day, i.e., on or about February 20, 2013, Phoenix used approximately $744,956.00, which it received from Account One to pay off its mortgage loan with the Bank.

**F.     The Defendant Vehicle**

58.     On or about October 16, 2013, Loung used funds that he fraudulently obtained from the United States Mint to purchase the Defendant Vehicle.

59.     As previously discussed in paragraph 53, Account One was opened on or about August 17, 2012, and a signatory in Account One's opening

- 20 -

WM-003266

documents is Luong.  On or about October 7, 2013, America Naha deposited approximately $3,230,389.26 from the United States Mint into Account One.

60.    On or about October 16, 2013, Luong purchased the Porsche for approximately $81,000.  Luong obtained a Bank Cashier's Check drawn on Account One in the amount of approximately $81,000 payable to the Porsche of Plano.  "Kei Yi Loung" is named as the customer on the Cashier's Check.

WM-003267

## **FIRST CLAIM FOR FORFEITURE**

61.     The allegations contained in paragraphs 1 through 60 of this Verified Complaint for Forfeiture *in Rem* are incorporated herein and made part hereof.

62.     The Defendant Properties, and all property traceable thereto, were involved in or are traceable to violations or attempted violations of 18 U.S.C. §§ 371, 485, 486, 487, 545, 641, 1343, and 2320.

63.     As a result of the foregoing, the Defendant Properties and all property traceable thereto are subject to condemnation and forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

WM-003268

## SECOND CLAIM FOR FORFEITURE

64.     The allegations contained in paragraphs 1 through 60 of this Verified Complaint for Forfeiture *in Rem* are incorporated herein and made part hereof.

65.     The Defendant Properties, and all property traceable thereto, represent (a) property used, or intended to be used, in any manner or part, to commit or facilitate the commission of an offense in violation of 18 U.S.C. § 2320 or a conspiracy to commit such offense; and/or (b) property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of an offense in violation of 18 U.S.C. § 2320, or a conspiracy to commit such offense.

66.     As a result of the foregoing, the Defendant Properties and all property traceable thereto are subject to condemnation and forfeiture to the United States for its use, in accordance with 18 U.S.C. § 2323.

- 23 -

WM-003269

**WHEREFORE,** Plaintiff requests that the Clerk of the Court issue a warrant for the arrest in rem and seizure of the Defendant Properties; that notice of this action be given to all persons who reasonably appear to be potential claimants to the Defendant Properties; that the Defendant Properties be forfeited and condemned to the United States of America; that Plaintiff be awarded its costs and disbursements in this action; and that the Court award such other and further relief as it deems proper and just.

PAUL J. FISHMAN
United States Attorney

/S/ *Lakshmi Srinivasan Herman*
By:  LAKSHMI SRINIVASAN HERMAN
Assistant United States Attorney

March 20, 2015
Newark, New Jersey.

- 24 -

WM-003270

STATE OF NEW JERSEY     :
                                  : ss.

COUNTY OF ESSEX            :

    I, Anthony Lanzillotti, hereby verify and declare under penalty of perjury that I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, that I have read the foregoing Verified Complaint for Forfeiture *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

    The sources of my information and the grounds of my belief include the official files and records of the United States, information supplied to me by other law enforcement officers, and my own investigation of this case.

    I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

                                    Anthony Lanzillotti
                                    Special Agent
                                    Department of Homeland Security
                                    Homeland Security Investigations

Sworn to and subscribed before me this
day 20th of March 2015, at Newark, New Jersey.

PETER W. GAETA, ESQ.
Attorney-at-Law of the State of New Jersey

WM-003271

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WEALTHY MAX LIMITED,                              :        Civil Action No 15-5875
                                                  :
         Plaintiff,                               :
                                                  :
                                                  :        Filed:
vs.                                               :
                                                  :
                                                  :
UNITED STATES DEPARTMENT OF THE                   :        18 U.S.C. § 983, 5 U.S.C. § 701
TREASURY; UNITED STATES BUREAU                    :        28 U.S.C. § 2201; 28 U.S.C. §1361
OF THE MINT; UNITED STATES BUREAU                 :        Fourth Amendment
OF CUSTOMS AND BORDER PROTECTION                  :        Fifth Amendment
SERVICE; Jacob J. Lew, Secretary of the           :        Pa. R. Civ. P. 1701 et. seq.
United States, Department of the Treasury;         :
Rhett Jeppson, Deputy Director of the United       :
States Mint; R. Gil Kerlikowske, Commissioner      :
of United States Customs and Border Protection,    :        Jury Trial Demand
and UNITED STATES OF AMERICA,                     :
                                                  :
         Defendants.                              :

**AMENDED COMPLAINT**

I.       **Preliminary Statement**

1.       This is an action by Wealthy Max Limited, a Hong Kong-based company that redeems mutilated United States currency under the United States Mint's ("Mint") Mutilated Coin Redemption Program.  Wealthy Max seeks: (1) to obtain payment and other relief for shipments of coins delivered to the United States in 2014 and 2015 in accordance with arrangements made by the Mint for redemption of these coins; (2) monetary damages caused by the unlawful seizure of property; and (3) attorney's fees and costs available by statue and at common law.

2.       Wealthy Max has had a long-term unblemished relationship with the United States Mint ("Mint") redeeming mutilated coins under the Mint's Mutilated Coin Redemption Program.  Beginning at least as early as 2014, however, the Department of

1

Homeland Security began a campaign to end the redemption of China sourced mutilated coins based upon misguided and unsupported suspicions that coins redeemed by Wealthy Max and others were counterfeit. These unfounded fears culminated in the United States Attorney's Office for the District of New Jersey filing a civil asset forfeiture case for a separate shipment of Wealthy Max coins that are not the subject of this suit: *United States v. One 2014 Black Porsche Cayman Coupe et al., Civil Action 15-cv-5814 (JS).*[1] On July 21, 2016, after a hearing on Wealthy Max's Motion to Dismiss, the Honorable Juan R. Sánchez dismissed the Complaint with prejudice.

3.     This action involves additional shipments of Wealthy Max property valued at over $3.25 million.[2] As more fully explained below, these coins were delivered to the United States pursuant to arrangements made with the Mint. The Defendants have kept the coins without making payment to Wealthy Max, and without taking any judicial action to justify confiscation of the property, or providing Wealthy Max any due process to challenge the taking of this property. Instead, the government has simply refused to compensate Wealthy Max for these shipments without justification or explanation.

4.     The Defendants' lawless conduct has deprived Wealthy Max of over $3.25 million, severely damaged the company's reputation, and caused it to expend significant legal fees in an attempt to force payment that has been unlawfully forfeited. The Defendants' actions constitute a violation of the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983

---

[1] The Complaint was initially filed in the District of New Jersey but the action was transferred to the Eastern District of Pennsylvania and Judge Sanchez in October 2015.

[2] Under the Mutilated Coin Redemption Program, the Mint redeems mutilated coins according to weight formulas. The formulas deliver values that approximate the face value of the coins being redeemed. For example, four quarters weigh an amount that translates in $1 in redemption value.

2

("CAFRA"), the Administrative Procedure Act and the Fourth and Fifth Amendments to the United States Constitution.

5. After trying unsuccessfully to obtain any explanation for the Defendants' conduct, on October 29, 2015 Wealthy Max filed its first complaint in this action under the Civil Asset Forfeiture Reform Act ("CAFRA")(18 U.S.C. § 983), and the Fourth and Fifth Amendment to obtain a judicial judgment ordering, among other relief, that the Defendants pay Wealthy Max for the shipments in question.

## II. JURISDICTION AND VENUE

6. This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Mandamus and Venue Act, 28 U.S.C. § 361, for vindication of rights under CAFRA, as well as the Fourth and Fifth Amendments to the United States Constitution.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1356, 1361 and 2201; under 5 U.S.C. § 702; and by virtue of its inherent equitable powers.

8. Venue is proper in the United States District Court for the Eastern District of Pennsylvania where the Mint is located. A substantial portion of the events, and the acts complained of giving rise to this action, occurred within this district. Wealthy Max, and its affiliated company, Glory Smart, has been dealing with the employees of the Philadelphia Mint to provide mutilated coins for smelting for 14 years.

## III. PARTIES

9. Plaintiff, WEALTHY MAX LIMITED ("Wealthy Max") is a Hong Kong-based company that reclaims damaged coins from scrap metal that is shipped to China to be sorted and recycled. Wealthy Max and Glory Smart are affiliated companies. Wealthy Max and

3

Glory Smart have done business with the Mint without incident since at least 2002.  In 2014, the shipments began to be made through Wealthy Max in Hong Kong after a corporate reorganization.  Wealthy Max and Glory Smart will be referred to herein as "Wealthy Max."

10.     Defendant UNITED STATES DEPARTMENT OF THE TREASURY ("DEPARTMENT OF THE TREASURY" or "TREASURY") is an executive department and administrative agency of the UNITED STATES OF AMERICA that is charged with oversight of the nation's money and finance.

11.     Defendant UNITED STATES BUREAU OF THE MINT ("Mint") is a bureau of the DEPARTMENT OF THE TREASURY and an administrative agency responsible for coinage struck by the United States for use as currency.  The Mint is also responsible for implementation of the Mutilated Coin Program that was begun in 1911.

12.     Defendant UNITED STATES BUREAU OF CUSTOMS AND BORDER PROTECTION SERVICE ("CBP") is an agency within the Department of Homeland Security.  CBP agents are responsible for the seizures that are the subject of this action.

13.     Defendant Jacob J. Lew, is the Secretary of the DEPARTMENT OF THE TREASURY.  In such capacity, he possesses authority to direct the action and operations of that department.  He is sued in his official capacity.

14.     Defendant Rhett Jeppson is the Deputy Director of the UNITED STATES MINT.  In such capacity, he possesses authority to direct the action and operations of the MINT.  He is sued in his official capacity.

15.     Defendant R. Gil Kerlikowske is the Commissioner of U.S. Customs and Border Protection Service.  In such capacity, he possesses authority to direct the action and operations of that service.  He is sued in his official capacity.

### IV.     The Wealthy Max Shipments Unlawfully Seized

16.     There are three shipments of mutilated coins at issue in this lawsuit.  Their combined redemption value exceeds $3.25 million.  All the shipments were sent to the United States on the basis of instructions from the Mint as to destination locations, arrival days, type and size of packaging.  For ease of reference, the shipments will be identified as "The March 2015 Melted" shipment, the "LA Warehouse Detained" shipment" and the "Dollar Coins."

### a.     The March 2015 Melted Shipment

17.     On March 25, 2015 Wealthy Max delivered to the Mint's designated foundry, PMX Industries in Cedar Rapids, Iowa, three shipments of mutilated coins, each with a redemption value of $793,644.10, for a total redemption value of $2,380,922.30.  This is the largest shipment of Wealthy Max coins at issue.  These coins arrived in the United States pursuant to arrangements made with the Mint.  The coins passed through CBP customs inspection before being delivered to PMX.  At PMX, the coins were again inspected and the shipment was accepted for melting.  The Mint had PMX melt these coins on or about March 25, 2015.  The resulting melt was used to make new U.S. coins.  Sometime during the inspection, sample coins were drawn from the shipment and sent to an independent laboratory for testing. The test results indicated that the sample coins conformed to Mint specifications for genuine U.S. currency.[3]  Despite having confiscated and converted these coins to its own use, the Mint refuses to pay for these coins or to state the basis for its refusal to do so.  The government has *de facto* forfeited the payment of $2,380,992.30, not including interest, due Wealthy Max for having confiscated and converted these coins.

_____

[3] The Mint sent the sample coins to an independent laboratory, Laboratory Testing, Inc.  The April 17, 2015 Certified Test Report is attached as Attachment 1, bates numbered USA 00021-00026.

### b.      The LA Warehouse Detained Shipment

18.      These coins were brought into the United States pursuant to arrangements made with the Mint for the purpose of redemption.  These coins have a redemption value of $793,664.10.  They arrived at the Port of Los Angeles on September 14, 2014.  CBP issued a detention notice on October 14, 2014.  The Detention Notice indicated "Possible Admissibility Issues" and stated the coins could be detained for up to 30 days.  On January 29, 2015, after the 30 day detention period had passed, Wealthy Max demanded the release of its property.  This demand was ignored without explanation.  The government has kept these coins since that time without declaring them contraband, obtaining a search warrant, instituting a civil asset forfeiture proceeding or affording Wealthy Max any due process.  The coins cannot be considered contraband as the government's own lab report conducted on samples taken from this shipment concludes, "The samples have a broad range of date, mint marks, and their weights and alloy compositions are indistinguishable from standard currency."[4]

### c.      Dollar Coins

19.      Wealthy Max also arranged with the Mint for delivery of dollar coins to the United States for redemption in the fall of 2014.  These coins have a redemption value of $80, 248.22.  As per instructions, the coins arrived at the Port of New York.  The shipment was detained, inspected, released by CBP and delivered to the United States Mint, Philadelphia, Pennsylvania on October 16, 2014.  Wealthy Max has not been compensated for this delivery.  The government has kept these coins since that time without declaring them contraband, obtaining a search warrant, instituting a civil asset forfeiture proceeding or affording Wealthy Max any due process.  The coins cannot be considered contraband as the government's own lab

---

[4]  See CBP Laboratory Report, January 21, 2015, Attachment 2, bates numbered USA 00017-00020.

6

report on samples taken from this shipments concludes, "The samples have a broad range of date, mint marks, and their weights and alloy compositions are indistinguishable from standard currency."[5]

### V.     Statement of Facts

### A.     The Mutilated Coin Redemption Program

20.     The United States Mint has a Mutilated Coin Redemption Program that was instituted in 1911.  One purpose of the program is to help the Mint understand how many coins are out of circulation.  The redemption of waste coins also provides the Mint with recycled material to make new coins.  According to a Mint spokesman Michael White: "The Mutilated Coin Redemption Program's basis is to back and promote confidence in U.S. coinage by ensuring that even mutilated U.S. coins (which financial institutions are unlikely to accept because bent, deformed, or partial coins which generally cannot be counted by machine) are ultimately redeemable."[6]

21.     Mutilated coins are coins that are bent, broken, not whole, or fused or melted together.  The Mint is the only government agency that redeems mutilated coins.  The Mint directs that mutilated coins should be sent to the Mint in Philadelphia, Pennsylvania.  The Mint accepts large shipments of coins from coin recyclers but directs that certain large shipments be sent to specific designated smelters.  PMX U.S. –a subsidiary of Poongsan Corp., the world's largest supplier of coinage blanks, based in Seoul, South Korea - is one of two smelters in the United States with which the Mint arranges to have mutilated coins received and converted into

---

[5] See CBP Laboratory Report, February 10, 2015, Attachment 3, bates numbered USA 00012-00014.

[6] See Coin World, Mint Adopts Mutilated Coin Redemption Program Changes, September 16 2011, available at http://www.coinworld.com/news/us-coins/2011/09/mint-adopts-mutilated-coin-redemption-program.html#.

7

molten metal. The metal is then converted into coiled coinage strip (coin roll) and used to make new U.S. coins.

22. Wealthy Max is in the business of collecting mutilated U.S. coins and those of 24 other nations both through its own operations and through purchase of coins from other scrap reclamation concerns. For 14 years, Wealthy Max has enjoyed an unblemished record as a Mint supplier and has delivered continuous shipments of mutilated coins.

23. Previous shipments of mutilated coins submitted by Wealthy Max have been melted by PMX and converted into coiled coinage strip from which blanks are punched for pennies, nickels, dimes, quarters, half dollars and dollars. The Mint has received, accepted and converted over $38 million of distressed or mutilated coins supplied by Wealthy Max since at least 2002. Many of the coins in circulation in the United States were made from melted and reused mutilated coin supplied by Wealthy Max.

24. Wealthy Max ships the coins from Hong Kong to the United States after making arrangements for a delivery schedule with Mint personnel in Philadelphia. The coins are shipped in containers and in weights designated by the Mint. An independent third party in Asia inspects the coins sent by Wealthy Max for redemption before they leave for the United States. Wealthy Max assumes the cost of the inspection, shipping and insurance of the coin shipments to the United States after making arrangements with Mint personnel for the redemption of the shipments.

25. Upon entry into the United States, the coins are inspected by CBP to pass through Customs. Two of the three shipments that are the subject of this lawsuit were inspected by CBP, cleared and released.

26. After many years of direct dealings between the Mint and Wealthy Max, a

8

regular procedure for the shipment and receipt of mutilated coins developed. Under that procedure, these are the steps followed in arranging and conducting a shipment of mutilated coins: (a) whenever Wealthy Max has accumulated a store of mutilated coins and is prepared to ship them to the United States, it so advises the Mint; (b) Mint personnel determine the date when it or a contractor will be prepared to receive the shipment; (c) once the delivery time and location have been set, Wealthy Max will make preparations to meet that schedule; (d) before leaving Hong Kong, the coins are packed in containers meeting Mint specifications; (e) at the designated delivery point (either the Philadelphia Mint or one of two foundries that act as the Mint's agent to receive shipments of mutilated coins) the coins are again inspected, (f) once accepted, the coins are melted and the melt is used to make new coins; and (g) within several weeks after melting, the Mint wires the funds due and owing to Wealthy Max's bank account.

27.     The Mint instituted heighted inspection procedures in 2008 in response to a Treasury Office of the Inspector General "OIG" report, which noted the possibility of fraud by vendors seeking to redeem counterfeit mutilated coins. As part of its investigation, the Treasury OIG had a Mint metallurgist test the metal profile of numerous samples coin shipments, including some from Wealthy Max. The result was, "Approximately 50 samples were selected from each shipment for examination by a Mint metallurgist. The metallurgist subsequently confirmed that the coins were, in fact, genuine U.S. coins."[7]

**B.      Homeland Security Investigation and Follow-On Litigation**

28.     Beginning at least as early as 2014, the investigative branch of the Department of Homeland Security ("Homeland Security Investigations" or "HSI") and the

---

[7] See, Department of the Treasury Office of Inspector General (OIG) Management Implication Report 2008-0096, review of the Mutilated Coin Program, released February 16, 2010, p. 3, available at http://www.governmentattic.org/12docs/TreasuryOIG-MIP2008-0096_2010.pdf.

Office of the United States Attorney for the District of New Jersey initiated a campaign to terminate the Mutilated Coin Redemption Program on the basis of misguided and unsupported suspicions that coins tendered to the Mint for redemption by Wealthy Max and certain other businesses that relied on a supply of mutilated coins recovered from scrap materials in China were counterfeit.

29.     There has never been proof nor plausible indication that any of the coins tendered to the Mint under the Mutilated Coin Redemption Program were counterfeit. Nevertheless, the government obtained a warrant and on September 17, 2014 seized $2,388,091.18 due and owing to Wealthy Max for a different shipment of coins also tendered to PMX and melted on or about June 26, 2014.

30.     On March 20, 2015, the government filed a Complaint for Forfeiture in Rem in the District of New Jersey against the $2,388,091.18 previously due and payable by the Mint to Wealthy Max. The title of the case was *United States v. One 2014 Black Porsche Cayman Coupe, et al.,* Civil Action 15-cv-5814 (E.D. Pa)(JS)("the forfeiture case"). The complaint was originally filed in New Jersey but later transferred from the District of New Jersey to the Honorable Juan R. Sánchez, of the Eastern District of Pennsylvania on October 20, 2015. Despite the coins being inspected, accepted and melted by the Mint, the Complaint contended that the coins were counterfeit.

31.     On July 14, 2016, a hearing was held on Wealthy Max's Motion to Dismiss the Complaint. At the hearing, the government conceded that the complaint contained many false allegations. Judge Sánchez pressed the government attorney: "So you concede that you were factually wrong….They [Wealthy Max] gave a whole bunch of other examples [of

10

false allegations]."[8]  The government responded: "Yes.  Judge, I mean, you know, string us up.... I admit we were wrong in certain of the allegations in the Complaint."[9]

32.     On July 21, 2016, the Complaint was dismissed *with prejudice*.

33.     With respect to the coins at issue in this case, the Defendants have never initiated any judicial proceeding that Wealthy Max could challenge.  Instead, Wealthy Max's money and property has simply been forfeited.  The government's lawless conduct has deprived Wealthy Max of money lawfully due it, severely damaged its reputation and caused it to expend significant amounts of money for legal fees in order to obtain the funds lawfully due it.  The government's actions constitute a nonjudicial civil forfeiture of the coins amounting to a *de facto* taking without compensation and without any due process of law.  The Defendants' actions violate CAFRA and the Fourth and Fifth Amendments to the United States Constitution.

## C.     The Government's Unlawful Conduct Against Wealthy Max's Property

### a.     The March 2015 Melted Shipment

34.     As described above, this shipment was inspected, packaged and insured for delivery to the U.S. Mint care of PMX Industries in Cedar Rapids, Iowa.  The coins arrived at the Port of Los Angeles and were detained, inspected and released through Customs by CBP, an arm of the Department of Homeland Security.  The coins were then delivered on March 25, 2015, to PMX, the Mint's contractor, in Cedar Rapids, Iowa.

35.     Once at PMX, the coins were again inspected, accepted and melted.  The conversion of the coins to a melt used by the Mint to make new coin roll constituted a

---

[8]  *United States v. One 2014 Black Porsche et al.*, Civil No. 15-5814 (E.D. Pa.)(JS), Transcript of July 14, 2016 Motion to Dismiss Hearing, p. 99-100.

[9]  *Id.* at 104.

11

nonjudicial forfeiture of Wealthy Max's property. In fact, the Mint took ownership of the coins and Wealthy Max's property no longer exists. The Mint has unlawfully seized the payment owed for these coins.

36. An administrative forfeiture of property need not take any specific form. The government has administratively forfeited payment to Wealthy Max in violation of CAFRA and the Fourth and Fifth Amendment. The Mint took possession and *de facto* asserted title when they accepted and melted the coins. In other words, the government forfeited Wealthy Max's property. As the Third Circuit stated in *Langbord v. Department of the Treasury et al.,* No. 12-4574, 2016 WL 4073269, *6, (3d Cir. Aug. 1, 2016)(en banc):

> "Forfeiture," as previously noted, involves a transfer of title from one party to another.... As these definitions indicate, the essential difference between a "seizure" and a "forfeiture" is that in the former, the government obtains *possession* while in the latter it obtains *title* (i.e., *ownership*). (citation omitted)(emphasis in original).

37. By the government's conduct, (the melting of the coins and converting the melt to the use of the United States government) it effectively initiated nonjudicial civil forfeiture proceedings. The coins no longer exist, therefore, the government cannot return the coins. The taking was permanent. Taking ownership of the coins and failing to pay for them constitutes a forfeiture of the payment owed Wealthy Max.

**b.      The October 2014 LA Warehouse Detained Shipment**

38. In October 2014, Wealthy Max shipped another container of coins with a redemption value of $793,664.10 for delivery to the Mint's designated smelter, PMX Industries. The coins were detained by CBP at the Port of Los Angeles. CBP issued a detention notice on October 14, 2014. The detention notice advised that there were "Possible Admissibility Issues." The notice also stated "[s]hipments may be detained for up to 30 days, unless statutory authority

12

or interagency agreement mandates that a longer period of time is required ...."[10]  As noted above, the CBP Laboratories tested sample coins from this shipment and concluded, "The samples have a broad range of date, mint marks, and their weights and alloy compositions are indistinguishable from standard currency.

39.     The Department of Homeland Security requested that Wealthy Max provide further information about how Wealthy Max obtained the coins it sought to redeem. This information was provided, but the thirty day detention period passed with no statement or action by the government regarding the basis for the continued detention of the shipment.  The government has taken no further action such as obtaining a search warrant or instituting a civil forfeiture action.  On January 29, 2015, through counsel, Wealthy Max demanded "the immediate release" of Wealthy Max's property.

40.     By its conduct, (providing notice of detention of the coins for up to thirty days and then refusing the demand by Wealthy Max for the return of its property, or the release of the property to be delivered to delivery to the Mint or PMX, its designated foundry), the government effectively initiated a nonjudicial civil forfeiture proceeding and *de facto* took ownership of this shipment of Wealthy Max property.  The government afforded no due process such as obtaining a search warrant or instituting a civil asset forfeiture action.  Under these circumstances, the remedy is the payment to Wealthy Max for the value of this shipment.  The Defendants know from the testing of the sample coins that they are not contraband and as such not subject to the CAFRA "customs carve –out." 18 U.S.C. § 893(i).

41.     Administrative forfeiture does not have to take any specific form.  The government effectively instituted an administrative forfeiture when it notified Wealthy Max that

---

[10]  The Notice of Detention is attached as Attachment 4.

the property would be detained for 30 days, but then converted that seizure into a permanent taking.

42.     The Defendants have taken *de facto* ownership of Wealthy Max's property and have refused the January 29, 2015 demand for its return. The October 14, 2014 Detention Notice and the subsequent refusal to return Wealthy Max's property without any due process, constitutes a *de facto* ownership by the government of this property and invokes the protections of CAFRA.

       c.     **Dollar Coins delivered to the United States Mint, Philadelphia, Pa.**

43.     Wealthy Max delivered a shipment of dollar coins to the United States Mint in Philadelphia, PA on October 16, 2014. The coins have a redemption value of $80,248.22. These coins arrived at the Port of New York, were subject to intensive inspection by the CBP and were then released for transport to the Mint. Wealthy Max has received no payment for these coins.

44.     The Mint has held these coins since October 16, 2014 and refused to take any legal action to justify seizure of the coins or to pay Wealthy Max for them. The Mint continues to hold the coins without any pretense of providing due process. There has been no judicial warrant obtained and no civil forfeiture action instituted. The Mint has not even acknowledged that it still holds the coins, or whether the coins have been melted. In all respects, the Mint has operated as if it now owns the coins without affording Wealthy Max any due process.

## VI.   Causes of Action

**First Cause of Action:**   **CAFRA VIOLATION WITH RESPECT TO THE MARCH 2015 MELTED SHIPMENT**

45.   Plaintiff repeats and realleges as if fully set forth herein each and every allegation set forth in paragraph numbers 1 to 44.

46.   The United States has engaged in shocking and outrageous conduct with respect to the refusal to make payment of $2,380,992.30 for the coins melted at PMX on March 25, 2015. The Mint inspected, accepted and melted these coins. Sample coins from the shipment were then tested and found to be genuine. The Mint's non-judicial forfeiture of payment for these coins has been done in violation of CAFRA, and the Fourth and Fifth Amendment to the United States Constitution.

47.   CAFRA, 18 U.S.C. § 983 provides, in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties, such notice shall be sent in a manner to achieve proper notice as soon as practicable, and in no case more than 60 days after the date of the seizure. The melting of the Wealthy Max coins on March 15, 2015 constituted taking ownership of this shipment, triggering the protections of CAFRA. The coins no longer exist but the payment has been seized in a nonjudicial forfeiture.

48.   After taking ownership of the coins, the Defendants have failed to seek any legal forfeiture of the coins under the provisions of the Civil Asset Forfeiture Reform Act.

49.   The Defendants did not send any written notice to Wealthy Max within 60 days after the date of the seizure of the coins (by melting) on March 25, 2015.

50.   CAFRA requires that when - as here -the government fails to file a timely complaint for forfeiture, it must "promptly release the property" back to the person(s) who filed a

15

claim for the return of the property. The Wealthy Max coins no longer exist. By converting the Wealthy Max coins to its own use, the Mint took ownership of the coins in violation of CAFRA and the remedy is the release of the payment to Wealthy Max in the amount of $2,380,992.30.

51. The United States knows full well its obligation under CAFRA. In fact, the Mint melted a nearly identical shipment valued at $2,388,091.18 on June 24, 2014. In that case, the government seized payment for the shipment and instituted a civil asset forfeiture action. Given its day in court, Wealthy Max had that Complaint dismissed *with prejudice*. Here, the government took the exact same action in accepting and melting the coins, but elected not to follow the dictates of CAFRA to allow Wealthy Max an opportunity to vindicate its rights. But, by accepting and melting the coins, the government took actual ownership of the property, triggering its CAFRA obligations.

**Second Cause of Action: CAFRA VIOLATION: THE LA WAREHOUSE DETAINED SHIPMENT**

52. Plaintiff repeats and realleges as if fully set forth herein each and every allegation set forth in paragraph numbers 1 to 51.

53. Defendants have also violated CAFRA with respect to the shipment valued at $793,664.10 that was detained by the Department of Homeland Security on October 14, 2104. The notice of detention stated that the goods could be detained for up to thirty days. Thereafter, Wealthy Max demanded the return of its property. This request was ignored. The detention notice, which became permanent, constituted a non-judicial asset forfeiture notice to Wealthy Max. The Defendants know from their testing that these coins are not contraband. Homeland Security has refused Wealthy Max's demand to return the property, but has taken no further action, including instituting a judicial forfeiture proceeding to justify the refusal to return the property to Wealthy Max.

16

**Third Cause of Action:  Unlawful Seizure -- Fourth Amendment Violation**

54.     Plaintiff repeats and realleges as if fully set forth herein each and every allegation set forth in paragraph numbers 1 to 53.

55.     The Defendants' action also violated Wealthy Max's rights under the Fourth Amendment with respect to each of the shipments of coins identified above.  By seizing and confiscating the coin shipments without probable cause, a warrant, or any other reasonable justification, Defendants have acted contrary to plaintiffs' rights under the Fourth Amendment, in violation of and as actionable under the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).  By reason of the foregoing, the seizure and confiscation of the coin shipments should be held unlawful and set aside, and Defendants and their successors should be compelled to make payment to Wealthy Max for the confiscated coins.

56.     At no time have Defendants given any written notice of seizure or filed any application with a neutral and detached magistrate for a warrant authorizing seizure of Wealthy Max's payments for the coins melted at PMX on March 25, 2015 or for seizure of the LA Warehouse coins or the Dollar Coins.

57.     At no time have Defendants presented proof evidencing probable cause to seize Wealthy Max's payment for or seizure of these coins shipments.

58.     By seizing and confiscating payment for the March 25, 2015 melted coins without probable cause, a warrant, or any other lawful justification, and seizing the LA Warehouse shipment and the Dollar Coin shipment, Defendants have deprived Wealthy Max of its right to be secure in their persons, property, and effects, in violation of the Fourth Amendment to the United States Constitution.

59.     By virtue of its inherent equitable powers to remedy constitutional

17

violations, and pursuant to 28 U.S.C. § 2201, this Court is possessed of authority and power to order defendants and their successors in office, to cause the payment of compensation for the coin shipments.

**Fourth Cause of Action: Due Process of Law—Fifth Amendment Violation**

60. Plaintiff repeats and realleges as if fully set forth herein each and every allegation set forth in paragraph numbers 1 to 59.

61. By seizing and confiscating payment for the March 2015 Melted coins and seizing the LA Warehouse Detained shipment and the Dollar Coin shipment without affording or submitting to any process whatsoever, Defendants have acted contrary to plaintiffs rights under the Fifth Amendment, in violation of and as actionable under the Administrative Procedure Act, 5 U.S.C. § 706(2)(8).

62. By seizing and confiscating payment for the March 2015 Melted coins and seizing the LA Warehouse Detained shipment and the Dollar Coin shipments without affording or submitting to any process whatsoever, defendants have deprived Wealthy Max of property without due process of law, in violation of the Fifth Amendment to the United States Constitution.

63. As described above, Wealthy Max has been deprived of its property without any process whatsoever. Defendants have confiscated property consisting of money needed by an ongoing business such as Wealthy Max. The unlawful confiscation of such a large sum of money has had an extremely detrimental effect on Wealthy Max's ability to conduct business.

64. By virtue of its inherent equitable powers to remedy constitutional violations, and pursuant to 28 U.S.C. § 2201, this Court is possessed of authority and power to

18

declare the seizure and confiscation of the coin shipments to be unlawful violations of the Fifth Amendment to the United States Constitution and to compel defendants and their successors in office, to make payment for this shipment of coins to Wealthy Max.

**Fifth Cause of Action—Replevin**

65.     Plaintiff repeats and realleges as if fully set forth herein each and every allegation set forth in paragraph numbers 1 to 64.

66.     Pursuant to Pa R. Civ. P. 1071 et. seq. (Action in Replevin) Wealthy Max seeks replevin of the March 2015 Melted shipment delivered to PMX Industries in Cedar Rapids, Iowa on March 14, 2015.  The shipment had a value of $2,380,992.30.  The coins were melted and cannot be returned.  Accordingly, Wealthy Max seeks replevin of payment, with interest, that has unlawfully been withheld by the Defendants.  The Mint in Philadelphia, Pennsylvania is unlawfully holding payment for the coins in the amount of $2,380,992.30.

**Sixth Cause of Action:  Declaratory Relief -CAFRA, 18 U.S.C. § 983**

67.     Plaintiff repeats and realleges as if fully set forth herein the allegations contained in paragraph numbers 1 through 64.

68.     Congress, via the enactment of the CAFRA, has directed that all executive departments and administrative agencies of the United States afford certain procedural safeguards in connection with any confiscation of property.

69.     Congress's purpose in enacting CAFRA was to prevent the government from retaining property allegedly subject to forfeiture without commencing a judicial proceeding wherein private claimants of such property could be assured of their day in court.

70.     Toward this end, Congress expressly prescribed, in 18 U.S.C. § 983(a)(3), twin remedies for the redress of the government's failure to institute timely compliance with the

19

requirements of CAFRA; prompt release of the property alleged to be subject to forfeiture and permanent enjoinment of future action to confiscate that property.

71.     As property owners who have been denied prompt opportunity to contest a governmental seizure and confiscation of their property, and who have been denied the use of a substantial sum of money in its ongoing business, Wealthy Max is among those persons for whose specific benefit Congress enacted CAFRA and provided judicially enforceable remedies for undue governmental delay.

72.     By reason of the foregoing, and pursuant to 28 U.S.C. § 2201, Wealthy Max is entitled under 18 U.S.C. § 983 to bring suit against Defendants for declaratory relief to compel Defendants to discharge their statutory obligations under CAFRA.  By reason of the foregoing, this Court should declare that: (a) Defendants and their successors in office, are required under the plain dictates of CAFRA to cause return of the coins shipment to Wealthy Max, or pay Wealthy Max for the value of the shipments; and (b) Defendants and their successors in office, are barred from taking any further action to effect the civil forfeiture of the coin shipments.

**SEVENTH CAUSE OF ACTION: Relief in the Nature of Mandamus - Mandamus and Venue Act**

73.     Plaintiff repeats and realleges as if fully set forth herein each and every allegation set forth in paragraph numbers 1 to 64.

74.     At all times relevant hereto, defendants LEW, JEPPSON and GIRLIKOWSKE, in their official capacities to act for the DEPARlMENT OF THE TREASURY, the UNITED STATES MINT, and U.S. CUSTOMS AND BORDER PROTECTION respectively, have had a nondiscretionary duty to give notice to Wealthy Max of the seizure and cause the prompt commencement of a proceeding for forfeiture of the coin

shipments.

75.     Defendants have failed to give sixty days' notice of the *de facto* seizure of two on Wealthy Max's coins shipments in violation of CAFRA. Defendants have also failed to institute any civil asset forfeiture action for the Wealthy Max shipment for which Wealthy Max did receive a detention notice. More than eighteen months have passed since Wealthy Max counsel demanded, on January 29, 2015, the return of all of Wealthy Max's seized property. The Defendants' actions have been in violation of CAFRA.

76.     By reason of the foregoing, this Court has the power and authority, pursuant to 28 U.S.C. § 1361, to grant to the Wealthy Max relief in the nature of mandamus, compelling Defendants, and their successors in office, to make payment for the value of the coin shipments.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that a judgment be granted declaring that:

a)     Defendants have violated CAFRA in seizing and confiscating Wealthy Max's payment for the March 2015 Melted coins and the LA Warehouse Detained coin shipment; and

b)     Defendants have deprived Wealthy Max of property without due process of law, in violation of the Fifth Amendment with respect to all of the Wealthy Max shipments; and

c)     Defendants have denied the Wealthy Max its right to be secure in its person, possessions, and effects, in violation of the Fourth Amendment with respect to all the Wealthy Max shipments; and

d)     Compelling Defendants and their successors in office, to provide Wealthy Max compensation for the coin shipments in the amounts of $2,380,992.30 for the March 2015 Melted shipment, $793,664.10 for the detained LA Warehouse Detained shipment, and

21

$80,248.22 for the Dollar Coin shipment; and

e)      Enjoining Defendants and their successors in office from instituting, or causing to be instituted, any action at law or in equity to seize, forfeit, or confiscate the coin shipments or payment for the coin shipments; and

f)      Awarding interest on the compensation for the coin shipments from March 15, 2105 for the Melted Shipment; for the LA Warehouse Detained Shipment from January 29, 2015, the date upon which Wealthy Max counsel demanded the return of the coin shipments; and from October 16, 2015 for the Dollar Coin shipment delivered to the Mint in Philadelphia; and

g)      To the extent not already compensated, awarding Wealthy Max $2,380, 922.30 plus interest on the Replevin cause of action; and

h)      Awarding reasonable attorneys' fees and costs in favor of the Plaintiff; and

i)      Ordering such other relief as the Court may deem just and proper.

### Jury Demand

Plaintiff hereby requests a trial by jury on all issues so triable.

By:      _____
         ROBERT E. CONNOLLY
         BRADFORD L. GEYER
         GeyerGorey LLP
         1220 L Street, NW
         Suite 100, #418
         Washington, DC  20005-4018

Dated:  August 29, 2016

22